## Bennett v. Commonwealth.

(Decided May 13, 1930.)

334

J. RIVERS WRIGHT for appellant.

J. W. CAMMACK, Attorney General, and JAMES M. GILBERT, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY COMMISSIONER STANLEY—
Reversing.

Some time during the night of July 2, 1926, Mrs. Rosa Bennett, the appellant's grandmother, as well as adopted mother, who had reared him from infancy, was murdered with a club for the apparent purpose of robbery. The appellant has been twice convicted of that crime, and twice sentenced to die in expiation. His first conviction was set aside by this court because of the admission, without qualification, of his alleged confession. Bennett v. Commonwealth, 226 Ky. 529, 11 S. W. (2d) 437.

The deceased and the accused lived together on Sixth street in Louisville, and it appears that she had maintained herself and him principally through collecting rents from others to whom she sublet rooms in the large, old house in which they resided. The defendant, who was then about 21 years old, seems to have seldom, if ever, been employed in any occupation. He was engaged to be married, and on the evening of July 2, 1926, brought his fiancee to see his grandmother and to obtain her approval of the marriage. After taking the young lady to her home the defendant, according to his evidence, returned shortly after midnight and went to his room and went to sleep while lying across the bed only partially undressed. About 7 o'clock the next morning the body of Mrs. Bennett was found by other roomers. Her head was crushed in with a club. There were many circumstances proven indicating the defendant's guilt of this cruel crime, and he later signed a confession of having killed his grandmother, to which reference is made in the former opinion. This opinion does not call for a detailed statement of the evidence.

Upon this appeal counsel vigorously insist that the evidence conclusively shows that the confession and admissions made by the defendant were obtained through brutal force and extortion, and, being so conclusively

shown, it is argued those statements should, as a matter of law, have been omitted, rather than to have had their competency and admission submitted to the jury. A reading of the evidence relating to the manner and circumstances by and under which the confession was obtained convinces one that it was not as freely and cheerfully made as some of the officers testified, nor, on the other hand, that the accused suffered the very extreme, brutal treatment that he describes. The impression to be gathered, however, is that the provisions of the antisweating statute (Ky. Stats.) section 1649b-1 et seq., were violated. But because of the contradictory evidence in this regard, it was determined on the former appeal that the question as to whether the confession should be considered by the jury should under appropriate instructions be submitted to the jury in accordance with the rule of practice followed in this jurisdiction. That was done on this trial. For aught that is known the jury may have under that instruction disregarded the confession, for there was ample evidence other than that warranting the defendant's conviction.

There was, however, one grave error committed in the introduction of evidence relating to a statement of the accused. He had been kept at detective headquarters all day Saturday after the discovery of the crime and again on the Monday following from 9 to 4 o'clock without food. The assistant commonwealth's attorney, who has since become the commonwealth's attorney, was there throughout the day also participating in the examination of the accused and others. According to the testimony of the officers, Bennett had stated that, while he had nothing to do with the crime, he had seen Elwood Beales coming out of the window with a club during the morning or night of the murder. The commonwealth's attorney testified to having had a conversation during the afternoon with Bennett about Beales, who had vigorously denied his guilt. The accused called him off into a corner of a room in the detective department and asked him if he wanted an innocent man to confess to a crime he did not commit. The attorney assured him he did not, and that he ought never to do that; but he admonished Bennett that if he was guilty he ought not to send an innocent man to the electric chair and should exonerate Beales if he was not guilty. As a part of that conversation the prosecuting attorney testified, "He asked me if

I would let him plead guilty and take life imprisonment;'' or, as stated in another place, ''He asked me if I would permit him (to plead guilty) and see that he got life imprisonment, and I told him no, I was powerless to do such a thing; that a jury must sit on this case because of its severity.'' The attorney would not say that the accused was not struck on that day, and evaded inquiries as to whether he had been illegally questioned. He stated that no one ''unduly coerced'' him.

Counsel vigorously protested against the introduction of all evidence relating to the statements of the accused and made additional specific objections to this testimony of the commonwealth's attorney because introduced in rebuttal. That is not so material. But there is great vice in the substance of the testimony.

It has been often written that a prosecuting attorney should act impartially and see that justice is fairly meted out, which requires fair dealing with an accused in calling him to account for his crime. It is his duty to see that the legal rights of the accused, as well as those of the commonwealth, are fully protected; to prosecute and not persecute; to conduct himself with due regard to the proprieties of the office. He represents the people of the state, and in a degree should look after the rights of a person accused of a crime by endeavoring to protect the innocent and seeing that truth and right shall prevail. Howerton v. Commonwealth, 129 Ky. 482, 112 S. W. 606, 33 Ky. Law Rep. 1008; Bailey v. Commonwealth, 193 Ky. 687, 237 S. W. 415; Bazzell v. I. C. R. R. Co., 203 Ky. 626, 262 S. W. 966, 967; Little v. Commonwealth, 209 Ky. 263, 272 S. W. 721; Dalton v. Commonwealth, 216 Ky. 317, 287 S. W. 898; Johnson v. Commonwealth, 217 Ky. 565, 290 S. W. 325.

As to his testifying in the case, it may be said in general that, in the absence of a disqualifying interest, an attorney has always been regarded as a competent witness for his client. Nevertheless, it is a matter of delicacy and a practice not approved, except where the necessity of circumstances require his testimony. That consideration is particularly true as respects a prosecuting attorney. See Urban v. Commonwealth, 195 Ky. 704, 243 S. W. 916; Cummings v. Commonwealth, 221 Ky. 301, 298 S. W. 943.

On the broad ground of public policy and for cogent specific reasons, in all judicial tribunals and by statute

in this state, an attorney is considered as a privileged witness and may not without consent disclose communications made to him in his professional capacity, except when his advice is sought in contemplation of the commission of a crime or perpetration of a fraud. Cummings v. Commonwealth, supra; compare Bazzell v. I. C. R. R. Co., supra. In this case on the occasion mentioned the accused clearly indicated that what he was about to say to this lawyer for the people was to be confidential. He was not cautioned or warned that whatever he might say would be disclosed. Confidence reposed should be confidence respected. Because of the relation occupied by the commonwealth's attorney and the circumstances surrounding this particular consultation, we are not so sure but that all this statement should have been excluded on that ground.

But of this we are sure: That it was improper to permit the attorney to testify as to the offer of compromise made by the accused. While the question asked the prosecuting attorney—who controls the procedure and whose recommendations as to punishment are usually followed—does not expressly acknowledge guilt, the offer afforded a basis for an inductive conclusion of guilt. Perhaps the more serious and vicious effect was on the degree of punishment. Nothing in the law of evidence is more universally accepted or more firmly fixed than that admissions made expressly for the purpose of effecting a compromise of a matter in controversy and offers to buy peace cannot be proved against the party making them. The imperious desire that controversies be amicably adjusted and litigation settled demands the exclusion. Says Chamberlayne on Evidence, sec. 1440, concerning this subject: "So highly does the positive law regard the attainment of peace between parties to a controversy that a rule of procedure, the substantive law applied to procedure, has, though with ever decreasing stringency, ordained that if such could reasonably have been the motive for making the offer of compromise it will be taken, as matter of law, that such was the object. It will be assumed that the thought was to buy peace regardless of liability. It is, accordingly, the fiat of procedure that the statement should not be received against the party making it. It is peremptorily rejected, when offered for such a purpose. Any act, other than a state-

ment, done for the purpose of facilitating a compromise settlement will be excluded for the same reasons, should the inferences from it tend to establish a concession of liability on the part of the doer. In certain jurisdictions the mere fact that an offer of compromise has been made, even that an intimation has been extended to the effect that such an offer would be made have been treated as equally excluded by the rule of procedure. All evidence in respect to the terms of such a statement or suggestion is rejected.''

No distinction is to be drawn between the rules relating to the admissibility of evidence in criminal and in civil cases, except where the admissions are made under circumstances of constraint. Greenleaf, secs. 2a and 193.

We must strip the question of all extraneous matter and subsequent developments and view the picture or situation as it appeared at the moment. The defendant being faced with circumstances evidencing his guilt and for two days kept under the watchful eyes of detectives and the prosecuting attorney—accepting their version only—may have offered to acknowledge guilt, even though innocent, in order to obtain peace and save his life. Such an offer of compromise does not necessarily represent the youth's judgment of what he ought to receive in the end, but what he was willing to do to avoid death. In a civil case such an offer is not a concession of wrong done, nor does it express what one thinks his adversary is entitled to receive, but only represents what the one offering it is willing to yield to secure peace and a settlement of the controversy. Wigmore, sec. 1061. How much more reason is there for the application of the salutary rule in a criminal proceeding? The disputes in civil actions are small things compared to charges involving one's very life. Perhaps the universality of this rule of practice and the peremptory demands for its application account for the absence of a reported criminal case involving it so far as an exhaustive research has been able to disclose. It is true we find the statement in 16 C. J. 630: ''A voluntary offer by accused before trial to plead guilty on terms to the offense charged is competent as his admission.'' But the two cases cited as authority do not support the statement without qualification, for the offers to plead guilty on terms were made in each case to an arresting officer and the decisions are rested on the ground that the officer had no authority to do what was

asked of him. Furthermore, it did not appear the statements were made under circumstances indicating confidence, or that the parties were led into making them under the faith of an impending compromise. The facts of those two cases are very different from the facts now before us.

The rule here established and the idea of immunity from disclosure, however, ought never to be extended to offers or communications made for an unlawful purpose, such as compounding a crime or obstructing justice. The interest of public justice requires that no such shield from merited exposure shall be interposed to protect a person who takes counsel how he can safely commit a crime, or endeavors to thwart the administration of justice.

Vigorous prosecution of crime is expected, and officers meeting those demands should be, and are, commended. But their zeal ought not to consume the recognition of their entire duty—to the accused as well as to the accuser—nor lead them into discarding rules which are the product of experience and accepted as the best means of establishing justice. An accused, says Bishop (sec. 89) ''must be proceeded against step by step according to the rules ordained by the law. The law's rules must be applied or the law's penalty cannot be imposed.''

We are fully aware of the prevalent criticism of courts for delay in concluding prosecutions for crime, much of which is undoubtedly justified. We are cognizant of the fact that justice delayed is often justice denied, with the result that guilty men escape punishment altogether, or have their punishment unreasonably delayed. But none of those considerations, nor all of them can ever justify the conviction and condemnation of a man without a fair trial, conducted in due form of law. Society, and the soverign state representing society, does not require it.

The court concludes that the defendant is entitled to another trial, and the judgment is accordingly reversed.

Whole court sitting.