**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Tommie Dell ROSS and Dorothy Ruth Ross, Defendants-Appellants.**

**No. 73–2203.**

United States Court of Appeals, Fifth Circuit.

May 9, 1974.

Charles C. Foster, Houston, Tex. (court-appointed), for defendants-appellants.

William S. Sessions, U. S. Atty., San Antonio, Tex., Edward S. Marquez, Ronald F. Ederer, Asst. U. S. Attys., El Paso, Tex., for plaintiff-appellee.

Before JONES, THORNBERRY and COLEMAN, Circuit Judges.

COLEMAN, Circuit Judge:

On December 20, 1971, the Supreme Court decided Santobello v. New York, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427. It was there held that plea bargaining is an essential component of the administration of justice and, properly administered, is to be encouraged. In Santobello, the bargain for a particular plea was for the purpose of securing the dismissal of more serious charges, including no sentence recommendation by the prosecutor.

The present appeal requires the application of Santobello principles to prosecutorial presentation of evidence and oral argument to the trial jury.

Tommie Dell Ross and Dorothy Ruth Ross, husband and wife, of Waco, Texas, were convicted of fraudulently conspiring to import heroin into the United States from Juarez, Mexico, and of actually importing it (two counts). Ross was sentenced, among other things, to fifteen years imprisonment while his wife was sentenced to five years imprisonment. According to brief of the appellants (Court appointed counsel) Ross is at Leavenworth and Mrs. Ross is at Alderson.

For the reasons hereinafter stated, we reverse these convictions and remand for a new trial.

Since the verdict was for the government, we give its version of the facts.

On or about November 29, 1972, Mrs. Glenna Faye Sims, Tommie Dell Ross, Dorothy Ruth Ross, and their two year old child went to El Paso, Texas, in appellants' automobile to do some Christmas shopping.

On the following day, about 5:00 p.m., all went to the "Club 77", Juarez, Mexico. At approximately 6:00 or 6:30 p.m. Mrs. Sims felt tired and told the Rosses she wanted to return to El Paso, however, they wanted to remain in Juarez a little longer. About this time, they left the club and Mr. Ross went down the street about a block while Mrs. Ross and Mrs. Sims waited for him outside the club. Mr. Ross returned and went back into the club with Mrs. Ross. Mrs. Sims waited in the car with the Ross baby. After a while, appellants came out and got into the car. From there they drove to a taxi stand to get a cab for Mrs. Sims for her return to El Paso. In the car, Mrs. Ross removed from her brassiere some packages wrapped in tissues, gave them to Mr. Ross, who in turn gave them to Mrs. Sims. Mrs. Sims inquired

as to what they were, to which Mr. Ross replied that it wasn't anything and to place them in her brassiere and not in her purse. Mr. Ross then proceeded to get a taxi for Mrs. Sims. Prior to this, both appellants had instructed Mrs. Sims that when she got to the bridge, the only thing she had to do was to declare her citizenship, show her I.D. card, pay for the liquor and nothing else. Mrs. Sims was further instructed to wait for appellants at the first traffic light once over the bridge in El Paso, and they would follow in a little bit.

Mrs. Sims arrived at the bridge where she was met at primary by Inspector Willie Perez. Since she appeared to be nervous and overly friendly, Mr. Perez decided to send her to secondary for further examination. Mrs. Sims was taken to the office where she was searched by Inspectress Joy Martin. This revealed the packages of heroin. This happened at approximately 7:00 to 7:30 p.m.

Agent George A. Hirsch was notified to investigate the case. He advised Mrs. Sims that she was under arrest for possession of heroin. Mrs. Sims maintained that she did not know that the packages contained heroin. After relating to Agent Hirsch what had transpired in Juarez, the type of vehicle they were driving and where she was to meet them, she decided to cooperate with the Agent in delivering the heroin. Upon obtaining the description of the automobile, the inspectors were alerted, and it was determined that appellants had come through the bridge into El Paso, Texas, at 8:00 p.m.

A plan was devised whereby Mrs. Sims would deliver the heroin as originally planned by appellants. The same taxi, with its hood and trunk up, was to park approximately one block from the designated corner so that if appellants inquired why Mrs. Sims was late, she could use as an excuse that the taxi had broken down.

The agents and Mrs. Sims proceeded to meet the appellants, but neither they nor their car was anywhere around.

Mrs. Sims then located Mr. Ross by phone at the Society Club. Upon inquiry by Mr. Ross, Mrs. Sims told him that she was late because the cab broke down and that she had not been searched at the bridge. Mrs. Sims was told by Mr. Ross to wait where she was and that they would pick her up. While she was waiting, two police officers came up to Mrs. Sims and stopped to talk to her. Right about this time, Mrs. Sims noticed appellants' car come up and drive by without stopping. The car came back again through an alley where it stopped. Mrs. Ross got out of the car and went over to Mrs. Sims, and inquired of her what the policeman wanted. Mrs. Ross and Mrs. Sims proceeded to the car where Mr. Ross was waiting. Mrs. Sims sat in back and Mrs. Ross in the front passenger seat. In the car, Mrs. Sims gave the heroin to Mr. Ross who in turn gave it to Mrs. Ross to place in her brassiere. Mrs. Sims asked what it was, to which Mr. Ross answered with a smile, "Oh, nothing". As they drove away from the alley, the agents followed. At the appropriate time, the agents turned on their siren. Upon hearing the siren, Mr. Ross asked Mrs. Sims why she had not told them that there was a police car. Mr. Ross at this time tried to run away from the agents and told Mrs. Ross to throw the heroin away, which she did. Agent Hirsch stated that as they were following the appellants, Mr. Ross suddenly turned left into Eucalyptus Street. Mr. Ross then quickly turned right, jumping the curb, but could not proceed in that direction because there was a house in his way. He reversed the car and made a U-turn in the sidewalk area and proceeded back into Eucalyptus Street, however, by this time, the agents had him blocked and Mr. Ross was forced to stop his automobile. During the chase, Agent Hirsch saw the passenger side window go down where Mrs. Ross was sitting, and the heroin packages were thrown out but later retrieved by Agent Hirsch.

From this it will be seen that Mrs. Sims, not the defendants, performed the

act of transportation across the border. The defendants were never seen in possession of the contraband; Mrs. Sims was apprehended in possession of it. Later on, under police surveillance, Mrs. Sims says she gave the heroin to Ross, who gave it to his wife, and the police saw the packages thrown out a car window, although they could not see who threw them. To make a long story short, this case hinged altogether on the testimony of Mrs. Sims, who was caught at the border and who, in return for incriminating the Rosses, was neither arrested nor prosecuted.

In this state of affairs, while a witness for the government, on redirect examination government narcotic agent George A. Hirsch, over objection, was allowed to testify as follows [Tr. 211–218]:

"Q. (By Mr. Marquez:) Did you have a conversation with Mr. Ross after he was arrested?

"A. Yes, sir, I did.

"Q. Was this after he was advised of his rights, if he was?

"A. That's correct.

"Q. I'll ask you whether or not did he ever indicate to you during this conversation the price of this heroin? Did you ever get around to talking about price?

Objection and overruled.

"Q. (By Mr. Marquez:) Okay, what if anything did he say, Mr. Hirsch?

"A. Okay, Mr. Ross stated that he would take the blame for everything if I would release his wife. *At this time I had already talked to you* (emphasis ours) and you expressed the thought that if he is going to do this, then we will go ahead and not file on Mrs. Ross. But he came out with some story about—

"Q. Excuse me, Mrs. Ross did have a child with her at the time, is that correct?

"A. About a two or three year old child. And I said look, Tommy, I said if it is actually your stuff and you are responsible for it, then fine, I'll go along with you giving me a statement. But if it's not yours, I don't want any part of your statement.

RECROSS EXAMINATION

*By Mr. Abraham:*

"Q. Mr. Hirsch, when you arrested Mr. Ross, you told him you were going to take him and his wife to jail, didn't you?

"A. Correct.

"Q. You told them that they were under arrest?

"A. Right.

"Q. And then you had a further conversation with Mr. Ross, did you not?

"A. Yes.

"Q. What you just told Mr. Marquez?

"A. Yes, sir.

"Q. And his remarks were 'I'll take the blame for everything. I'll say it's my stuff. I'll take the blame for everything. But let my wife go'. Isn't that what he told you?

"A. That's correct.

"Q. And then did you arrest Mrs. Ross? Did you put her in jail and arrest her?

"A. No, I didn't.

"Q. And she was permitted to go on back to Waco?

"A. Correct.

"Q. And when was it that you arrested her?

"A. We detained her at the time we stopped the car at Eucalyptus and San Antonio.

"Q. The question I was asking is when did you arrest Mrs. Ross?

"A. Actually thinking back, I don't believe I placed her under arrest

at this time. I warned Tommy Ross that he was under arrest, warned him of his constitutional rights and then I turned and warned Mrs. Ross of her constitutional rights in the event that I did decide to put her under arrest. And so if she made any statements, she had been warned.

"Q. All right. Well, when you took Mr. Ross to the jail house there in El Paso, you took Mrs. Ross, didn't you?

"A. Yes, I took her to our office.

"Q. And then you subsequently took her to the jail, didn't you? Or excuse me, you took Mr. Ross to the jail, didn't you?

"A. Yes, sir.

"Q. Enroute from the place of the arrest to your office, had Mrs. Ross wanted to leave, you wouldn't have permitted her to, would you?

"A. At this time, no.

"Q. So then whenever Mr. Ross told you 'I'll take the blame for all of the stuff, I'll take the blame for all of the stuff but let my wife go', is when you let her go?

"A. Yes, but he didn't put it that way. He said 'If I take the blame, is there a chance you will let my wife go'?

"Q. Okay. And your response to that was yes?

"A. I said I will discuss it with the United States Attorney and we will see what he decides."

During closing argument, the prosecutor said,

"He [Ross] was arrested. He was apprehended. Later on after he was questioned, he tried to make some deal with the agents that he would be willing to take the rap for everything if they would turn his wife loose". [Tr. 251–252].

Defense counsel immediately objected and the Court instructed the jury not to consider the last remark, the last statement.

From the foregoing, we have no doubt that Ross' discussion with the agent, especially since the prosecutor had already been consulted, must be classified as an effort to bargain a plea. Moreover, it is undisputed that in pursuance of it the wife was released and went back to Waco. For reasons not readily apparent from the record, the proposed bargain was not consummated. At least we know that the wife was prosecuted and that both she and her husband pleaded not guilty.

■■ If, as the Supreme Court said in *Santobello*, plea bargaining is an essential component of justice and, properly administered, is to be encouraged, it is immediately apparent that no defendant or his counsel will pursue such an effort if the remarks uttered during the course of it are to be admitted in evidence as proof of guilt. Moreover, it is inherently unfair for the government to engage in such an activity, only to use it as a weapon against the defendant when negotiations fail.

■ The testimony concerning the discussion between the agent and Ross should not have been admitted. It should not have been made the subject of comment in the closing argument.

For this the convictions must be reversed and remanded for a new trial.

Upon a retrial, the jury must be carefully instructed as to the testimony of accomplices and the prosecutor must be careful not to comment on the failure of the defendants to testify if, as before, they do not take the witness stand.

Reversed and remanded.