(No. 50635)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. WILLIAM RODERICK HILL, Appellant.

*Opinion filed February 22, 1980.*

RYAN and UNDERWOOD, JJ., concurring in part and dissenting in part.

William P. O'Malley, of O'Malley, Royce & Hopkins, Ltd., of Chicago, and Elmer Gertz, of Chicago for appellant.

William J. Scott, Attorney General, of Springfield, and Bernard Carey, State's Attorney, of Chicago (Donald B. Mackay and Melbourne A. Noel, Assistant Attorneys General, of Chicago, and Marcia B. Orr, Iris E. Sholder, Joan S. Cherry, Assistant State's Attorneys, of counsel), for the People.

James J. Doherty, Public Defender, of Chicago (Robert P. Isaacson, Aaron L. Meyers, and John Thomas Moran, Assistant Public Defenders, of counsel), *amicus curiae.*

Theodore A. Gottfried, State Appellate Defender, of Springfield (Robert E. Davison, Legal Director, and Martin Carlson, Richard E. Cunningham, Verlin Meinz, John H. Reid, Charles M. Schiedel, and Mark Schuster, Assistant Appellate Defenders, of counsel), *amicus curiae.*

MR. CHIEF JUSTICE GOLDENHERSH delivered the opinion of the court:

In a jury trial in the circuit court of Cook County, defendant, William Roderick Hill, was found guilty of two counts of murder and one count of conspiracy to commit murder. At the request of the People, pursuant to section 9—1(d) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(d)), a separate sentencing proceeding was conducted before the jury which had found defendant guilty. The jury returned a verdict recommending that defendant be sentenced to death, and the circuit court imposed sentence in accordance with the jury's recommendation. The circuit court also sentenced defendant to a term of imprisonment of not less than 6 years and 8 months nor more than 20 years for conspiracy. Defendant appeals directly to this court. Ill. Const. 1970, art. VI, sec. 4(b); Ill. Rev. Stat. 1977,

ch. 38, par. 9—1(i); 73 Ill. 2d R. 606.

Defendant, together with Dr. Max Murphy Kaye, was indicted for the murders of Allen Zipperstein on August 23, 1974, and Robert Fields on January 18, 1975. Dr. Kaye died prior to the trial. The People's witness, Vernice Geary, a dental assistant employed by Dr. Kaye, testified that Kaye had become angry with Robert Fields and said he would pay someone to kill him. Ms. Geary related the offer to defendant, who said he would do it. Approximately two weeks later she saw defendant and Dr. Kaye talking together. Later, she was asked to deliver to defendant a street diagram, a description of a car, and a picture of Robert Fields. When Dr. Kaye learned of the death of Allen Zipperstein, he told Ms. Geary that defendant had killed the wrong man. Nevertheless, Dr. Kaye paid defendant one-half of the agreed sum in cash, which Ms. Geary delivered. Thereafter defendant told her that as a matter of pride he would "finish the job." On the day Robert Fields was killed, defendant called Ms. Geary, told her he "took care of that job," and demanded more money.

Thyra Hart testified that she had met defendant at his place of employment. Shortly after meeting Ms. Hart, defendant told her that he had killed Allen Zipperstein for $10,000. A week later he showed her a checked sports jacket, identified at trial by other witnesses as the one worn by Allen Zipperstein's killer, and told her that he was wearing it at the time of the killing. Ms. Hart also testified that defendant described to her his preparations to kill Robert Fields. He had visited the Fields home "dressed as a gas man," knew Fields' habits well, and knew what kind of car he drove. After Robert Fields was killed, Ms. Hart was contacted by the police. She testified that shortly thereafter defendant demanded to see her, saying he knew she had talked to the police. She went to his place of employment and defendant would not permit her to leave until he ascertained from

the newspaper that the police had no new leads.

The People adduced the testimony of a number of other witnesses and introduced into evidence many exhibits which we find it unnecessary to summarize or describe; it suffices to say that the evidence supports the jury's verdict finding defendant guilty.

We consider first defendant's contention that the circuit court erred in admitting into evidence testimony concerning certain admissions made by defendant in the course of plea bargaining and that the error was so prejudicial as to require reversal. During the presentation of the People's case defendant moved orally for an order *in limine* to exclude all testimony concerning an offer by defendant to plead guilty to the two murders. The statements were made by defendant in the course of a conversation with Joseph Urso, an assistant State's Attorney who at the time of defendant's arrest was chief of the Cook County State's Attorney Felony Review Unit. The motion did not seek to exclude any other portion of the conversation. Following argument the circuit court denied the motion. Urso testified that after being confronted with the taped statement of A. J. Thomas, an alleged accomplice, defendant stated that "You have me on Fields, but not on Zipperstein." Defendant then asked to speak to Investigator Dvorak of the Chicago Police Department. Urso left the room while defendant talked with Dvorak, and upon returning to the room was told by defendant that he had killed Fields. Urso testified to additional statements made by defendant that he had studied Fields' habits and knew when he arrived at and what time he left work, and the kind of car he drove. He also stated that he had gone to Fields' house and, in order to be admitted, pretended to be a gas meter reader. He was then asked if he would give a statement to a court reporter. He stated that he wanted to see "the honcho." He repeated that he wanted to see "the honcho, the head man." Urso replied that he "guessed I was the

honcho because I determined what he was going to be charged with." The following ensued:

"Q. What did he say when you said that to him?

A. He said, 'I want to talk a deal.'

Q. He said, 'I want to talk a deal?'

A. Yes. And he asked me if I could talk a deal with him.

Q. What did you say?

A. 'Deal? I guess I could talk a deal with you, but the only person who could approve a deal would be the State's Attorney himself, Bernard Carey, but I can talk to you.'

Q. After you told him that the only one who could approve a deal, quote, unquote, would be Mr. Carey himself, did Mr. Hill say anything else to you?

A. Yes.

Q. What did he say?

A. He told me that he would confess to both murders, give a statement confessing to both murders, plead guilty to both murders and testify against Dr. Kaye, the person who paid him to kill Mr. Fields, if I could get him a signed affidavit from Mr. Carey that [he] would be sentenced to the minimum 14 years.

After hearing Mr. Hill say that I told him, 'That's no deal.' I asked him if he wanted to give a court reporter's statement or not. He said, 'Now I want a lawyer.' I said, 'Fine.' I walked out of the room and instructed the investigators and Commander DiLeonardi not to talk to him any more. The door was locked behind me as the officers left the room with me."

Joseph DiLeonardi, city-wide homicide commander for the Chicago Police Department, was also permitted to testify that defendant stated that he would plead guilty to both the Zipperstein and Fields murders if the State's Attorney would guarantee him a minimum of 14 years in the penitentiary. After Urso responded "No deal," defendant requested an attorney.

James Dvorak, at the time of trial a sergeant with the Chicago Police Department, was on January 20, 1975, an investigator in homicide cases. He testified that defendant requested to see "the top honcho" and that Urso "stated

he imagined he was the honcho." Dvorak testified that defendant stated that he wanted to talk a deal and that Urso replied that he didn't have the power to make deals since only Bernard Carey could make deals. Defendant stated "that as long as we had him on Fields he would plead guilty to both the Fields and the Zipperstein murder and would testify against Dr. Max Murphy Kaye if he were given a sworn affidavit from Mr. Carey that he would be given the minimum sentence, that being 14 to 14 and a day. Mr. Urso stated that that was not a fair deal." Upon being asked by Urso whether he wished to give a statement, defendant replied "No, I think I need a lawyer."

The People contend that there was no plea negotiation, and that defendant made the statement sought to be excluded after Assistant State's Attorney Urso had told him that he did not have authority to approve a "deal." Citing *People v. Carter* (1967), 38 Ill. 2d 496, they argue that since the offer was made to an assistant State's Attorney who had no authority to conduct the negotiation, the statements admitted into evidence did not constitute an offer to enter a plea of guilty. Alternatively, they argue that in the light of the overwhelming evidence of defendant's guilt, assuming that the court erred in admitting the testimony, the error was harmless.

Although the practice has frequently been criticized, the importance of plea bargaining in the administration of criminal justice was noted by the Supreme Court in *Santobello v. New York* (1971), 404 U.S. 257, 30 L. Ed. 2d 427, 92 S. Ct. 495. The court said:

> "The disposition of criminal charges by agreement between the prosecutor and the accused, sometimes loosely called 'plea bargaining,' is an essential component of the administration of justice. Properly administered, it is to be encouraged. If every criminal charge were subjected to a full-scale trial, the States and the Federal Government would need to multiply by many times the number

of judges and court facilities.

Disposition of charges after plea discussions is not only an essential part of the process but a highly desirable part for many reasons. It leads to prompt and largely final disposition of most criminal cases; it avoids much of the corrosive impact of enforced idleness during pre-trial confinement for those who are denied release pending trial; it protects the public from those accused persons who are prone to continue criminal conduct even while on pretrial release; and, by shortening the time between charge and disposition, it enhances whatever may be the rehabilitative prospects of the guilty when they are ultimately imprisoned. See *Brady v. United States* [(1970), 397 U.S. 742, 751-52, 25 L. Ed. 2d 747, 758, 90 S. Ct. 1463, 1470-71.]" 404 U.S. 257, 260-61, 30 L. Ed. 2d 427, 432, 92 S. Ct. 495, 498.

In *Kercheval v. United States* (1927), 274 U.S. 220, 71 L. Ed. 1009, 47 S. Ct. 582, the Supreme Court recognized the devastating effect of evidence of a withdrawn plea of guilty. (See also *People v. Steptore* (1972), 51 Ill. 2d 208.) In order that plea discussions may be conducted in an atmosphere of candor, free of the risk that statements made during negotiations will be used as evidence of guilt, our Rule 402(f) provides:

"(f) Plea Discussions, Plea Agreements, Pleas of Guilty Inadmissible Under Certain Circumstances. If a plea discussion does not result in a plea of guilty, or if a plea of guilty is not accepted or is withdrawn, or if judgment on a plea of guilty is reversed on direct or collateral review, neither the plea discussion nor any resulting agreement, plea, or judgment shall be admissible against the defendant in any criminal proceeding." 73 Ill. 2d R. 402(f).

Similar provisions are contained in Rule 410 of the Federal Rules of Evidence and Rule 11(e)(6) of the Federal Rules of Criminal Procedure.

The statement made by defendant was made after Urso told him "I guess I could talk a deal with you," and we find apposite the rationale of *United States v. Herman* (5th Cir. 1977), 544 F.2d 791. In *Herman* the defendant was taken to the Federal courthouse in Columbus, Georgia, for a removal hearing based upon a charge of murder in Orange County, Florida. He requested that an attorney be appointed to represent him, and the magistrate recessed the hearing in order to obtain an attorney. The defendant remained in the hearing room with two postal inspectors and discussed with them some aspects of the charge and at some point during the conversation made the offer that he would plead guilty to robbery charges and produce the gun used in the murder if the authorities would agree to drop the murder charges. The district court suppressed the statements on the ground that they were plea related. The government appealed. Affirming the judgment, the court of appeals said:

> "The government argues, however, that Herman's statements could not have been plea-related because the postal inspectors had no authority to negotiate a plea. We reject the government's position. The relevant factor is a defendant's perception of the government official's negotiating authority, not the official's actual authority. The twin goals of encouraging unrestrained plea negotiations and assuring fairness to defendants dictate that any statements made by a defendant as part of an effort to reach a plea agreement must be excluded; it makes no difference that the defendant's efforts are misguided because the official cannot or will not accept the offer." 544 F.2d 791, 798.

Concerning the People's argument that under *People v. Carter* (1967), 38 Ill. 2d 496, the conversation between defendant and Urso cannot be considered plea negotiations, although we do not imply that under Rule 402(f)

the distinction is of any significance, we point out that the offer there was made to a police officer, not an assistant State's Attorney. Furthermore, the discussion in the opinion in *Carter* concerns an ABA Standard (ABA Standards, Pleas of Guilty sec. 3.4 (Tent. Draft Feb. 1967)) proposed prior to the adoption of Rule 402.

We have considered the argument that the admission of the testimony was harmless error and do not agree. In *People v. Steptore* (1972), 51 Ill. 2d 208, in seeking to impeach the testimony of defendant's sister, the People adduced testimony of a police detective who testified that she had said to an assistant State's Attorney that "she would consider pleading her brother guilty for two to five or less." (51 Ill. 2d 208, 216.) This court, relying on Rule 402(f), and despite overwhelming evidence of the defendant's guilt, recognized the "devastating" effect of such evidence, and held that the error was so prejudicial as to require reversal. Accord, *United States v. Brooks* (6th Cir. 1976), 536 F.2d 1137; *United States v. Smith* (10th Cir. 1975), 525 F.2d 1017; *United States v. Ross* (5th Cir. 1974), 493 F.2d 771; *Wilson v. State* (1972), 253 Ark. 10, 484 S.W.2d 82; *Moulder v. State* (1972), 154 Ind. App. 248, 289 N.E.2d 522; *Bennett v. Commonwealth* (1930), 234 Ky. 333, 28 S.W.2d 24; *State v. McGunn* (1940), 208 Minn. 349, 294 N.W. 208; *State v. Sha* (1972), 292 Minn. 182, 193 N.W.2d 829; *State v. Abel* (1928), 320 Mo. 445, 8 S.W.2d 55; *People v. Thomson* (1954), 203 Or. 1, 278 P.2d 142; *Dykes v. State* (Tenn. 1963), 372 S.W.2d 184.

Because the judgment must be reversed and the cause remanded for a new trial, it is necessary to consider whether the death penalty provisions of section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—1) are applicable to this case. Defendant contends that the basic tenets of Illinois law preclude retroactive application of those provisions of section 9—1 to offenses allegedly committed by him during 1974 and 1975. He

argues further that were we to hold that the statute is to be given retroactive effect, such application would be violative of article I, section 16, of the Illinois Constitution of 1970 and article I, section 10, of the Constitution of the United States, which prohibit the promulgation of any *ex post facto* law. The People contend that *Dobbert v. Florida* (1977), 432 U.S. 282, 53 L. Ed. 2d 344, 97 S. Ct. 2290, permits the application of the statute as amended effective June 21, 1977, to these offenses and that there is no constitutional impediment to their application. The People argue that application of the statute is precluded only if defendant had an accrued right to be sentenced under the law in effect on the date on which the crimes were committed.

At the time of the commission of these homicides (August 23, 1974, and January 18, 1975) section 5—8—1A of the Unified Code of Corrections (Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—1A) provided that following a conviction for murder under section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1973, ch. 38, par. 9—1), if certain circumstances existed, a three-judge panel was to determine whether certain facts occurred and, if so, the defendant was to be sentenced to death unless a majority of the judges of the panel determined that there were compelling reasons for mercy and that no death sentence should be imposed. Section 5—8—1A also provided:

> "In the event that the death penalty in this Act is held to be unconstitutional by the Supreme Court of the United States or of the State of Illinois, any person convicted of murder shall be sentenced to imprisonment in the penitentiary for any indeterminate term with a minimum of not less than 14 years." Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—1A.

In *People ex rel. Rice v. Cunningham* (1975), 61 Ill. 2d 353, this court held section 5—8—1A unconstitutional. Thereafter, but prior to trial of this case, the General Assembly enacted Public Act 80—26. (Ill. Rev. Stat. 1977, ch. 38, par. 9—1.) Section 9—1(j), effective June

21, 1977, in pertinent part provided:

> "In the event that the death penalty in this Act is held to be unconstitutional by the Supreme Court of the United States or of the State of Illinois, any person convicted of murder shall be sentenced by the court to a term of imprisonment under Chapter V of the Unified Code of Corrections." Ill. Rev. Stat. 1977, ch. 38, par. 9—1(j).

Neither any provision of section 9—1 as enacted in 1977, nor its legislative history, shows any intent that the amendment apply retroactively. Indeed, the express provisions of section 5—8—1A and its reenactment in substantially identical form (section 9—1(j)) clearly demonstrate the contrary intent. We hold, therefore, that for these offenses committed in 1974 and 1975 defendant may not be sentenced to death pursuant to section 9—1 of the Criminal Code of 1961. We hold that if upon retrial defendant is convicted, he cannot be sentenced to death. Because of the conclusion reached we need not and do not discuss either the constitutional questions briefed and argued by the parties concerning the retroactive application or the questions concerning the constitutionality of the death penalty provisions of section 9—1 briefed and argued by the parties and *amici curiae,* the State Appellate Defender and the Public Defender of Cook County.

Defendant contends, and the People now concede, that the conviction for conspiracy must be vacated. Section 8—5 of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 8—5) provides that "No person shall be convicted of both the inchoate and the principal offense," and the conviction is accordingly reversed.

Defendant has raised, and the parties have briefed and argued, a number of other contentions. We have reviewed the briefs and arguments, and the authorities cited, and conclude that defendant's remaining contentions are either without merit or involve matters which are unlikely to occur upon retrial. They need not, therefore, be further considered here.

For the reasons stated the judgment is reversed and the cause is remanded to the circuit court of Cook County for a new trial.

*Reversed and remanded.*

MR. JUSTICE RYAN, concurring in part and dissenting in part:

The so-called plea bargaining involved in this case had nothing to do with defendant's admission of guilt as to the murder of Fields. It pertained solely to the murder of Zipperstein. The majority opinion clearly shows that the defendant had freely admitted his guilt as to the murder of Fields prior to the time that he attempted to bargain with the assistant State's Attorney for a plea of guilty to both murders. I would, therefore, affirm the defendant's conviction as to the murder of Fields and remand the cause to the circuit court of Cook County for resentencing. I concur in the majority opinion in all other respects.

MR. JUSTICE UNDERWOOD joins in this partial concurrence and partial dissent.