THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* TERRY HARDIMAN, Defendant-Appellant.

Fifth District   No. 79-89

Opinion filed June 4, 1980.

John H. Reid and Gary D. Duncan, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Clyde L. Kuehn, State's Attorney, of Belleville (Raymond F. Buckley, Jr., and Curtis L. Blood, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE JONES delivered the opinion of the court:

A jury found the defendant, Terry Hardiman, guilty of armed robbery for which he was sentenced to imprisonment for a term of 6 years. Defendant raises a single issue on appeal, whether it was error for the trial court to permit impeachment of defendant's testimony by "allegedly inconsistent prior statements made in a letter written by defendant to a probation officer, where such letter represented an offer to negotiate a plea."

The defendant and two other young men were arrested after an armed robbery of Church's Fried Chicken in East St. Louis on July 26, 1978. The other two men subsequently pleaded guilty to the offense. At defendant's trial on November 8 and 9, 1978, the evidence against him was substantial, not the least of which was an inculpatory two-page statement signed by him shortly after his arrest and waiver of *Miranda*-conferred rights. Pretrial he had moved without success to suppress the statement. According to the statement, given on July 28, 1978, defendant

and the other two young men had taken from Church's Chicken money which, when divided between them, amounted to about $37 apiece. Also according to the statement, defendant, using a revolver, had told the girl who waited on them to give him "all the money" and had fired three times at a car and driver pursuing them as they fled. The girl who had waited on them testified that she had picked defendant out of a lineup and had positively identified him as the man holding a gun who had ordered her to hand over all the money from the cash register. She had observed that this person had no front teeth. Later defendant was required over objection to exhibit his teeth to the jury. Although the record does not indicate the condition of defendant's teeth as exhibited, the context suggests that his front teeth were missing. Another of the restaurant's employees, a 19-year-old woman, testified that defendant had held the gun during the robbery and that she lived across the street from him, had known him since she was in the sixth grade and knew the other two young men with him also as neighbors. This witness and others testified with regard to the pursuit of the three, apparently by a patron of the restaurant, and the evidence of the exchange of gunfire that ensued.

The officer who had arrested defendant testified that he had advised him of his *Miranda* rights orally at the time of arrest and had been present later during that part of an interview with a detective in which defendant signed the written waiver of his rights. The detective testified that he had read to defendant from a standard statement of constitutional rights and warnings used by the East St. Louis police department and then had handed it to defendant to read. He said he had instructed defendant to initial it if he understood what he had read and, if defendant wished to talk to him, to read and sign the waiver at the bottom. Having initialled and signed that statement, defendant gave the inculpatory statement. As defendant gave the inculpatory statement a second time, the detective typed what defendant said and then handed the typed statement to him to read. Defendant's signature appears below the typed statement. On cross-examination the detective said that defendant had acted as an "informant" and that in the past he had talked to defendant about two cases, a felony and a misdemeanor. He denied having promised defendant that he would get him probation if he confessed. The arresting officer testified that defendant had worked with the arresting officer in an "undercover capacity, as a confidential source" for about a year prior to his arrest.

Defendant was the sole witness for the defense. He testified that the arresting officer had "made it known" that defendant was not under arrest and that the officer had wanted to talk to him at the police station "because I was an informant of his, and he wanted to question me about an armed robbery." Defendant denied both that his rights had been read

to him and that he had read them himself before initialling and signing the waiver. He said that the inculpatory statement was the detective's account of the events, not his, and that, in fact, he had said nothing at all during the interview. When pressed on cross-examination, he said he had not even provided the information, which appeared above the typed statement, as to his address and telephone number as well as the date and place of his birth, explaining that the detective "knew that from the time that I first started working with him." Defendant said that he "might" have told the detective on the day of his arrest—not during the interview—that he had been born in Chicago and that he had told his birth date to the detective in February—six months before the interview—while asking the detective if he could get defendant on the police force. Later on redirect he explained the presence of his signature on the forms:

"Well, [the detective] told me he would look out for me and that he would take care of me and that he would get me probation and he would tell the Judge that I worked with him on various cases and I trusted his word, you know, and I didn't think that he would lie to me because he was a police [*sic*] but after I was locked up I found out that police do lie because I can't get probation on armed robbery."

Defendant denied as well participation in the robbery of Church's Chicken. On cross-examination he remarked, "If I'm not mistaken, I was at my sister's house at the time they said the robbery was to have occurred."

During cross-examination the State attempted to impeach the credibility of defendant's testimony by prior inconsistent statements from a letter written by him to a probation officer. In proceedings had outside the presence of the jury, the State established that the letter was received on August 10, 1978, by the probation officer. Defendant declared that he did not know to whom he had written the letter. He said that he had been told that the addressee was a lawyer but that he was later told that he was "a Probation officer or something." The State had defendant read the following portion of the letter:

"I know that I did wrong and I am very sorry for my mistake. I was the only man at home and my mother and sister are very religious people and they need me and I need them very much."

Defendant explained that by "mistake" he referred to his "signing of the statement." The court ruled that part of the letter inadmissible because it was possibly ambiguous in its reference to the offense with which defendant was charged. The State attempted to clarify any ambiguity by another part of the letter in which defendant had written, "I will cop out in Court if you and the Judge guarantee me parole." Because the State could show that defendant had no other charges pending to which he

could "cop out," the court ruled that the State could pursue defendant's meaning of his use of the term "cop out."

Later in the presence of the jury defendant stated that he did not know who the addressee, Mr. Buett, was. After defendant admitted having written that he would "cop out" for a guarantee of parole, the State showed by his testimony that at the time he wrote the letter he was in jail as a consequence of his arrest for armed robbery and that he had no other charge to which he could "cop out." On redirect defendant said that he thought he was writing to a lawyer because he had been told at the jail that he was going to see a lawyer and that at the time he wrote the letter he had not yet talked with his attorney, the assistant public defender. Although the record is unclear, defendant appears to have spoken with Mr. Buett at the jail prior to having spoken with his attorney. In response to the State's question on recross of whether Mr. Buett had told defendant he was an attorney, defendant answered, "I can't say." In response to the State's further question of whether Mr. Buett had asked defendant about the circumstances of the offense, defendant answered, "I don't really know what we talked about. He told me my bond was $1,000.00." The letter itself was, of course, not in evidence and is not a part of the record.

The judge's remark at defendant's sentencing hearing that defendant had no prior convictions of any kind indicates that he had never been on probation. At trial and in his post-trial motion defendant objected to the prosecutor's characterization during closing argument of defendant's statement in the letter as evidence "to be held against him." Upon objection the court ordered the prosecutor's remark stricken and later instructed the jury as to the use of impeachment evidence.

■■ The State contends initially that defendant has waived review of the issue for failure to object on the specific ground that the letter represented an offer to negotiate a plea. Defendant had objected to the introduction of this evidence during the trial on the grounds that it was irrelevant and constituted an admission. In his motion for a new trial defendant assigned as error cross-examination of defendant by the State as to "an alleged letter supposedly written by the defendant to a Probation Officer." However, because of the prejudicial character of such an error, a court of review may consider the issue though it has not been properly preserved for review. *People v. Steptore* (1972), 51 Ill. 2d 208, 281 N.E.2d 642; *People v. Morris* (1979), 79 Ill. App. 3d 318, 398 N.E.2d 38.

The State contends alternatively that the letter cannot be considered an offer to negotiate a plea for two reasons, because defendant did not plead guilty and because defendant addressed his letter to a probation officer rather than to the prosecutor or to his own attorney. Our courts acknowledge the need in an overburdened system for the disposition of criminal charges by negotiation between the prosecutor and the accused

(*People v. Hill* (1980), 78 Ill. 2d 465, 401 N.E.2d 517) and for that reason encourage such disposition (*People v. Friedman* (1980), 79 Ill. 2d 341, 403 N.E.2d 229).

The State maintains that the instant letter cannot be considered a "plea discussion," because the addressee was merely a probation officer who owed defendant no duty of fidelity and the statement was consequently a mere admission.

The recent case of *People v. Cowherd* (1980), 80 Ill. App. 3d 346, 353, 399 N.E.2d 672, 676, appears to support the State's position. There the court stated that Supreme Court Rule 402(f) (Ill. Rev. Stat. 1977, ch. 110A, par. 402(f)) contemplates "actual plea discussions between the accused and the competent State authorities charged with the negotiations of guilty pleas and sentences." In *Cowherd* the arresting police detective testified as to the content of a conversation he had had with the defendant. The two had discussed the State's Attorney's offer of possibly a 5- to 12-year sentence to run concurrently with defendant's prior sentence in exchange for his plea. They had discussed as well the defendant's participation in the offense with which he was charged, the defendant's wish to speak with a certain person in the office of the "FBI" and to cooperate with that office and the defendant's further wish to serve his sentence in a Federal prison. The court thought that "something more formal and definite" was intended by Rule 402(f) than "a passing reference in a conversation between a police officer and defendant to constitute a plea negotiation or plea discussion within the meaning of the rule." (80 Ill. App. 3d 346, 353, 399 N.E.2d 672, 676.) The court did not think that the factual situation before it called for the invocation of Rule 402(f).

However, shortly after the decision in *Cowherd*, the supreme court in *People v. Hill* (1980), 78 Ill. 2d 465, 401 N.E.2d 517, rejected the State's argument that there could have been no plea negotiation where the defendant had made an offer to one who he knew lacked authority to approve it. In *Hill* an assistant State's Attorney testified that he had advised the defendant, who had approached him expressing the wish to make a "deal," that only the State's Attorney could approve such an offer. Despite that admonition the defendant had offered to confess in a statement to the two murders he was accused of committing, to plead guilty to both murders and to testify against the person who had paid him to kill a certain victim. The defendant had been willing to do these things in exchange for a signed affidavit from the State's Attorney that he would be sentenced to the minimum sentence of 14 years. Apparently unhappy with the reception the assistant State's Attorney gave his proposal, the defendant thereupon requested a lawyer. The *Hill* court relied upon the rationale expressed in *United States v. Herman* (5th Cir. 1977), 544 F. 2d

791, where the defendant had made an offer to plead guilty to robbery to two postal inspectors who had remained in a hearing room. The defendant had offered also to produce the gun used in the murder he was charged with if the murder charges against him were dropped. Quoting *Herman* at length, *Hill* extended the defendant even greater protection than *Herman* had:

" 'The relevant factor is a defendant's perception of the government official's negotiating authority, not the official's actual authority. The twin goals of encouraging unrestrained plea negotiations and assuring fairness to defendants dictate that any statements made by a defendant as part of an effort to reach a plea agreement must be excluded; it makes no difference that the defendant's efforts are misguided because the official cannot or will not accept the offer.' " (78 Ill. 2d 465, 473, 401 N.E.2d 517, 521.)

Although the defendant in *Hill* could not have misperceived the negotiating authority of the official with whom he spoke, as the defendant in *Herman* had done, nevertheless the *Hill* court considered the admission of the testimony so prejudicial that it required reversal.

In still another recent case, *People v. Morris,* a probation officer testified to an admission made to him by the defendant during an interview. The defendant had said that when the police arrived he and two others were robbing the victim. In *Morris* plea negotiations had been entered into prior to trial between the State and the defendant. Upon the State's request the court had ordered a presentence report. The defendant maintained that the report was intended to aid the plea negotiations and that "[h]e considered his cooperation with the probation officer in preparing this report a necessary step in the negotiation of his sentence." (79 Ill. App. 3d 318, 331, 398 N.E.2d 38, 48.) Attempting to define the limits of protected communications, the *Morris* court also relied upon *Herman* and rejected the State's argument that a plea discussion could not take place with a probation officer lacking the authority to negotiate a plea.

■■ The recent cases of *Hill* and *Morris* leave no doubt that a plea discussion protected by Rule 402(f) may take place between a defendant and a probation officer who lacks authority to engage in plea negotiations. Although in dicta the *Morris* court said that if a defendant knew an official lacked authority to negotiate a plea, the communication would fall outside the protective umbrella of Rule 402(f) and the supreme court in *Hill* subsequently ruled otherwise, that difference is irrelevant to the case at bar where the defendant testified to his confusion with regard to the identity of the addressee of his letter.

One further question remains, whether the disputed portion of defendant's letter falls within the scope of the term "plea discussion."

Recently in *People v. Friedman* the supreme court held that a defendant's unsolicited statement to an investigator of the Attorney General's office was a plea-related discussion and therefore inadmissible. The defendant, who had been indicted for a Federal offense arising out of the same series of transactions that had led to the charge for which he was being tried in State court, knew that the investigator had been assigned to investigate the defendant's indictment and had had with him approximately three conversations with regard to the indictment. The investigator testified that thereafter he had returned the defendant's telephone call and that during the course of the conversation the defendant had inquired about "making a deal" and had stated, "If I'm convicted, I would rather go to a Federal prison as opposed to a State prison." Rejecting the argument that the parties must be seated at the negotiating table before Rule 402(f) applies, the court said,

"A statement made as an offer to enter negotiation is indistinguishable from a statement made at an advanced stage of the negotiation process in terms of its impact upon a jury. Statements related to either stage of this process are equally devastating in the trial of the accused." (79 Ill. 2d 341, 352, 403 N.E.2d 229, 235.)

The court stated as well that to be characterized as plea related a discussion "must contain the rudiments of the negotiation process, *i.e.*, a willingness by defendant to enter into a plea of guilty in return for concessions by the State." To determine whether a statement is plea related, the court must consider whether "the accused exhibited a subjective expectation to negotiate a plea" and whether "this expectation was reasonable under the totality of the objective circumstances * * *." Any characterization of a statement as plea related must then turn, the court said, on the facts of each case.

■ In the case at bar defendant testified that he had been told that he was to see his attorney, that he had not seen him, that he had met with the addressee, Mr. Buett, who told him the amount of his bail bond, if nothing else, that he later wrote the letter to Mr. Buett in the belief that he was his attorney, and that he still later discovered that Mr. Buett was possibly a probation officer. If defendant did believe the addressee were his attorney, an expectation to negotiate a plea would, of course, have been reasonable. Whether it was reasonable for defendant to have concluded that Mr. Buett was his attorney we need not determine. We think that upon these facts it was not unreasonable for defendant to have concluded that Mr. Buett was a man of some authority, possessed of the power to negotiate a plea.

Although we do not have the substance of the entire letter, the two statements from it which we do have indicate conclusively the

defendant's desire to enter a plea of guilty in return for a concession by the State. Though the jury heard but one sentence of the letter, what they heard was an express and unequivocal offer made by the defendant to plead guilty to the offense charged in exchange for a guarantee of parole. As such the evidence was plea related and thus part of a plea discussion, inadmissible under Rule 402(f). Whether the defendant had confused "parole" with "probation" and whether he had proposed an arrangement calling for but slight concession on the part of the State is of no concern. Of concern is the jury's certain knowledge of the defendant's offer to plead guilty to the offense charged. Our courts deem an error of this kind so prejudicial that despite overwhelming evidence against a defendant, the error requires reversal. (*People v. Friedman; People v. Steptore.*) Therefore the judgment of the trial court is reversed and the cause is remanded for a new trial.

Reversed and remanded.

KARNS and KASSERMAN, JJ., concur.