LARRY S. EVANS *v.* STATE OF INDIANA.

[No. 2-174A46.   Filed March 6, 1975.   Rehearing denied April 10, 1975. Transfer denied May 27, 1975.]

*William H. Williamson,* of Indianapolis, for appellant.

*Theodore L. Sendak,* Attorney General, *A. Frank Gleaves, III,* Deputy Attorney General, for appellee.

## CASE SUMMARY

BUCHANAN, J.—The Defendant-Appellant Larry S. Evans (Evans) appeals from a jury conviction of Assault and Battery with Intent to Commit Robbery, claiming prosecutorial misconduct and insufficient evidence.

We affirm.

## FACTS

The undisputed facts and the evidence most favorable to the State are:

Between 11:00 and 12:00 o'clock p.m. on April 11, 1973, Evans, Larry Corpuz (Corpuz), and a third male appeared at the door of the Richard K. Miller (Miller) residence at 646 North Luett Street, Indianapolis, Indiana. They were seeking a person named Jerry Humphress. Miller informed Evans that Humphress had vacated the residence four or five days earlier.

Miller, his wife, Cheryl, and Ron Fults (Fults), who lived with the Millers, were asked by Evans and his companions if they had any drugs for sale. Miller replied that they had none and Evans, Corpuz, and the third individual left the residence. Miller and his wife then went to their upstairs bedroom to sleep with their three-month-old baby while Fults bedded down on the couch in the living room.

The next morning, April 12, 1973, at about 10:00 a.m., Fults heard a knocking on the door. As he opened it, Evans, accompanied by Corpuz and two other individuals, one male and one female, pushed their way inside the residence. Evans, who was carrying a gun, struck Fults on the back of the head with the gun, knocking him into a chair. Corpuz then quickly assembled a sawed-off shotgun and handed it to Evans while he threw Fults to the floor and tied his hands and feet with telephone cord, which had been ripped from the wall.

Evans and Corpuz then proceeded upstairs while their two companions guarded Fults with a pistol.

Miller testified that Evans woke him by grabbing his hair and sticking the shotgun into his face, saying, "This is a rip-off, get up and get your clothes on and get downstairs".

Once downstairs, Miller was bound hand and foot with lamp cord, his wallet containing thirty dollars was seized, and he was thrown on the couch by Corpuz. Evans brought Cheryl downstairs and ordered her to sit on the couch while they ransacked the house, taking two guitars, two tape players, and a stack of tape cartridges. Evans asked if there was any other item of value and Miller replied that there was nothing else. Evans then reached into and grabbed from Miller's front shirt pocket two hundred and fifty dollars cash, and then proceeded to kick and beat Miller into a state of unconsciousness.

Meanwhile, Corpuz took Cheryl back upstairs where she was told to go to the bedroom and stay. Soon thereafter, she observed Evans and the others leaving. She went down-

stairs and freed her husband and Fults . . . and the police were summoned.

A few days later, Fults and Miller identified Evans as the robber from a stack of photographs shown to them by the police and Evans was subsequently arrested.

Officer Kaiser of the Indianapolis Police Department testified he arrived at Miller's residence at 12:20 p.m. He first observed Fults bleeding from a wound on the back of the head and then noticed Miller on the couch with fresh bruises about his face and forehead. He also observed that the residence was in a disheveled state with various household items lying on the floor. Miller, Cheryl and Fults testified as State witnesses.

Evans and other defense witnesses testified that on the night of April 11, 1973, he had purchased drugs from Miller which turned out to be "bad" . . . and that he and his companions returned to the Miller residence the following day seeking a refund and an altercation ensued resulting in injuries to Miller and Fults.

At trial, the deputy prosecutor, in the presence of the jury, made references to "robber Evans" on three different occasions while questioning Fults:

Q. Had you ever seen the defendant prior to this day?
A. Yes, I had, the night before.

Q. The night before you saw him on April the twelfth?
A. Yeah.

Q. And was anyone with him that night?
A. Uh, the two male robbers, or whatever you want to call them, that was with him, was with him that night, the female was not there.

Q. So you saw robber Evans and his two friends the night before then?
A. Yes.

Q. And then you saw him the following day, is that correct . . . .
A. Yes.

Q. . . . on April the twelfth? And where did you first see Mr. Evans on April the twelfth?

A. Well, I was asleep on the couch and I heard somebody knocking at the door, and I got up and I answered the door, and he pushed his way in with a gun.

Q. And when you say he, who are you referring to?

A. Mr. Evans.

Q. Robber Evans over here, . . .

A. Yes.

Q. . . . the fellow you previously identified?

A. Larry Evans.

Q. Yes. What happened then?

A. He pushed me back to a chair and everybody else was standing right behind him at the door, and they came rushing in putting together shotguns and stuff, and he hit me in the head and knocked me down in the chair.

Q. When you say he, are you referring to . . .

A. Mr. Evans.

Q. . . . robber Evans again?

MR. GILROY: I am going to object, Your Honor, the prosecutor is making remarks derogatory to the defendant before the trial actually is concluded which would indicate malice and these remarks are improper.

THE COURT: Well, I will sustain the objection because I think he is overdoing it, and counsel will refrain from so referring to the defendant.

Upon resumption of the trial the following day, the deputy prosecutor once again referred to Evans as "robber Evans" during the direct examination of Miller:

A. Yeah, she was awake already, she was awake when I was awakened up.

Q. And what was she doing?

A. Getting up and putting her housecoat on.

Q. Was robber Evans the only one . . .

MR. GILROY: Objection, Your Honor, it is leading and the prosecutor is also using derogatory comments which he formerly used, Your Honor, which . . .

THE COURT: I don't see how you can say it's leading when he hasn't finished the question yet, but you are quite right about the comment and counsel was previously cautioned, and I remind counsel.

*MR. HOWARD:* Your Honor, I can't see it's already been testified to that he is the . . .

*THE COURT:* But you are not the jury, sir, . . .

*MR. HOWARD:* All right.

*THE COURT:* . . . and you have been cautioned by the Court, and enough is enough. Ask your question.

Also, during the trial the deputy prosecutor asked these three questions:

1. And who seems to be the leader of this whole group?
2. Of all the defendants there, who gave the orders?
3. If you had to point out one as a ringleader, who would you say?

Objections to these questions by Evans were sustained on the basis that no foundation had been laid . . . thus calling for a conclusion of the witness.

The jury found Evans guilty of Assault and Battery with Intent to Commit Robbery, and he was sentenced to imprisonment for a period of not less than one nor more than ten years. This appeal followed.

## ISSUES

ISSUE ONE. Were the remarks of the deputy prosecutor so prejudicial as to deny Evans a fair trial?

ISSUE TWO. Was there sufficient evidence to sustain Evans' conviction of Assault and Battery with Intent to Commit Robbery?

As to ISSUE ONE, Evans claims that he was prejudiced by the prosecutor's references to him as the "robber" and the "leader", and that these references constituted an "evidentiary harpoon".

The State contends that the fairness of the proceedings was maintained by the trial court by sustaining Evans' objections to the aforementioned remarks. Additionally, the State says the evidence of Evans' guilt was so conclusive that the prosecutor's references, though improper, were harmless.

As to ISSUE TWO, Evans maintains the evidence was conflicting and the jury was so prejudiced by the prosecutor's misconduct that reversible error resulted.

The State argues that the evidence of guilt was so overwhelming that a verdict of guilty was the only probable verdict, regardless of any remarks by the prosecutor.

## DECISION

ISSUE ONE

CONCLUSION—It is our opinion that although the conduct of the prosecutor was improper, such conduct was harmless and did not constitute reversible error.

As the party alleging prejudicial error based upon improper prosecutorial remarks, Evans has the burden of proving ". . . why such [improper conduct] . . . complained of . . . warrant(s) reversal". *Turczi* v. *State* (1973), 261 Ind. 273, 276, 301 N.E.2d 752, 753.

Furthermore, he fulfills that burden only when viewing all the circumstances it appears ". . . that the error placed him in a position of grave peril to which he should not have been subjected". *White* v. *State* (1971), 257 Ind. 64, 272 N.E.2d 312, 320.

As the Court said in *White* (quoting from *Kotteakos* v. *United States* (1945), 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557):

" 'If, when all is said and done, the conviction is sure that the error did not influence the jury, *or had but very slight effect,* the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress.' " (Emphasis supplied.) 257 Ind. at 75, 272 N.E.2d at 318.

*See also,*
*Robinson* v. *State* (1973), 260 Ind. 517, 297 N.E.2d 409;
*DeHority* v. *State* (1939), 215 Ind. 390, 19 N.E.2d 945.

We reached the same conclusion in *Garrett* v. *State* (1973), 157 Ind. App. 426, 437, 300 N.E.2d 696, 702:

"[M]isconduct of counsel may be harmless where it has no apparent effect on the outcome of the case. If the evidence is 'close', reversible error will more likely be found."

*See also,*

*Troyer* v. *State* (1888), 115 Ind. 331, 17 N.E. 569.

Prosecuting witness Fults first made the reference to Evans' two companions as "robbers". The deputy prosecutor picked up the reference and twice referred to Evans as a "robber" without objection. Evans' counsel objected for the first time after the third reference and the court sustained the objection cautioning the deputy prosecutor to refrain therefrom, although on the next day the deputy prosecutor repeated the reference and was again admonished after proper objection.

Also objections were made and sustained in each instance to the questions by the deputy prosecutor calculated to characterize Evans as the ringleader of the group. However, in this latter connection, there is sufficient other evidence in the record from which a reasonable inference could be made that Evans was in fact the leader of the group.

In none of these instances did Evans' counsel ask the court to admonish the jury to ignore the objectionable conduct.

There was substantial evidence by the three prosecuting witnesses and by two police officers who investigated the crime which supports the judgment convicting Evans of Assault and Battery with Intent to Commit Robbery. While there was conflict in the testimony given by Evans and his companions with that given by the State's witnesses, the evidence is not so "close" that the improper prosecutorial conduct could be said to have been responsible for the outcome. Nor could it be said that Evans was placed in a position of grave peril by virtue of the improper references to him as a "robber".

Evans' counsel did not object until the third reference was made, and the court did sustain objections when made and did caution the prosecutor to refrain from such remarks.

The totality of the circumstances of this case are such that these improper references were not so prejudicial as to deny Evans a fair trial, yet we hasten to add that such remarks by a prosecutor violate the Code of Professional Responsibility which provides that:

> "A lawyer shall not: . . . (4) Assert his personal opinion as to the justness of a cause, as to the credibility of a witness, as to the culpability of a civil litigant, or as to the guilt or innocence of an accused. . . ." [Canon 7; Disciplinary Rule 7-106 (c) (4).]

ISSUE TWO

CONCLUSION—It is our opinion that there was sufficient evidence of probative value to sustain the judgment convicting Evans of Assault and Battery with Intent to Commit Robbery.

We repeat those hoary precepts of Indiana appellate practice that we will not weigh the evidence nor determine the credibility of witnesses and will consider only that evidence most favorable to the State with all reasonable inferences which may be drawn therefrom; and the conviction will be affirmed if there is substantial evidence of probative value from which the trier of facts could reasonably infer that the defendant was guilty beyond a reasonable doubt. *See, Durbin* v. *State* (1957), 236 Ind. 379, 140 N.E.2d 510; *Hallums* v. *State* (1968), 249 Ind. 309, 232 N.E.2d 597; *Moore* v. *State* (1970), 254 Ind. 23, 256 N.E.2d 907; *Taylor* v. *State* (1973), 260 Ind. 64, 291 N.E.2d 890; *Stone* v. *State* (1968), 251 Ind. 198, 240 N.E.2d 487; *White* v. *State* (1967), 249 Ind. 105, 229 N.E.2d 652.

The testimony of the three victims and the investigating police officers is without conflict. Evans and his three companions pushed their way into the Miller residence about 10:00 a.m., April 12, 1973. Evans struck Fults and Corpuz tied him up. The pair then proceeded upstairs, forced the Millers out of bed, down the stairs, and proceeded to beat, bind, and rob Miller.

Miller and Fults both identified Evans as the "robber" from photographs shown to them by the police and, along with Cheryl, identified Evans at trial as the perpetrator of the crime.

Even Evans' version of what transpired lends itself to an inference that Evans and his companions returned on April 12 bent on vengeance.

Our view of the transcript convinces us that the evidence was more than sufficient to sustain the jury's verdict. [*See Sargent* v. *State* (1973), 156 Ind. App. 469, 297 N.E.2d 459.]

The judgment of the trial court entered upon the verdict of the jury is accordingly affirmed.

Sullivan, P.J., and White, J., concur.