Timothy R. MARTIN, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 82A01–8804–CR–114.

Court of Appeals of Indiana,
First District.

Sept. 20, 1988.

John D. Clouse, Michael C. Keating, Laurie A. Baiden Bumb, Evansville, for appellant.

Linley E. Pearson, Atty. Gen., Wendy L. Stone, Deputy Atty. Gen., Indianapolis, for appellee.

ROBERTSON, Judge.

Appellant-defendant Timothy Martin appeals from his conviction on two counts of dealing in a Schedule II controlled substance.

We reverse.

Narcotics investigator James Allison was contacted by John White with an offer to supply the names of various people White had made contact with and from whom White could make controlled buys. White hoped to garner favorable treatment for his wife, who faced a second revocation of her probation after she tested positive for drug use. One of the names White furnished to Allison was Timothy Martin.

On August 5, 1986 Allison accompanied White to Martin's trailer. White entered Martin's trailer, spoke with him briefly, and then motioned for Allison to come in. Allison told Martin, in terms familiar to drug users, that his source for Dilaudid was unable to supply him presently. Allison then told Martin that White "says that fours are going for sixty-five, is that right?" Martin answered yes and Allison gave him $65.00. Martin said he would have to leave to get the Dilaudid. After about twenty minutes, Martin returned to the trailer and gave Allison a small, yellow tablet with a "4" on one side and the letter K on the other. The tablet later was determined to be Dilaudid, the brand name for a synthetic opiate called hydromorphone.

Martin asked Allison for a portion of the drug, but Allison gave him $3.00 instead. Allison told Martin he might need to acquire more Dilaudid from him in the future, and Martin said that would be fine.

On August 6, a second buy was set up in White's trailer, which was across the street from Martin's. Allison again gave Martin $65, and again Martin was gone about 20 minutes. When he returned, he placed the tablets on a coffee table. Martin requested a portion of the tablet, and again Allison refused, this time giving him $5.00. Martin was placed under arrest several months later, sufficiently remote from the buys so as to protect Allison and White's identities. Martin was convicted after a jury trial.

Because we reverse, we decide only one issue: whether the trial court committed reversible error in allowing a police officer's testimony of Martin's attempt to open plea negotiations.

Martin urges reversible error in the admission of the following testimony of Officer Davies of the Evansville Police Department concerning a call he received from Tim Martin:

A. He [Martin] wanted to know if there was any kind of a deal that could be worked out.

[Defense counsel objected and moved for mistrial outside presence of jury; the court

overruled the objection and denied the motion for mistrial.]

Q. What did he have to say?

A. He asked if there was any sort of deal that could be worked out for him to receive a lesser charge or lesser sentence in return for him doing cases on people that he bought drugs from.

Officer Davies then testified that he asked Martin some preliminary questions regarding "who he could do" and which court he was charged in. No arrangement was ever concluded.

■ In Indiana, any communication relating to the plea bargaining process is privileged and inadmissible in evidence unless the defendant has subsequently entered a plea of guilty which has not been withdrawn. *Moulder v. State* (1972), 154 Ind.App. 248, 289 N.E.2d 522. Recognizing that plea bargaining is an "essential component of the administration of justice," the *Moulder* court observed that:

Consciousness of guilt, confession and admission against interest have no place in plea discussion or plea bargaining. Plea bargaining communications are for the sole purpose of reducing the punishment to be given the defendant. All other considerations or interpretations detract from its purpose and erode its usefulness.

*Moulder, supra,* 289 N.E.2d at 526.

The Fifth Circuit assessed the impact upon the administration of plea bargains if such statements were admissible:

"No defendant or his counsel will pursue such an effort if the remarks uttered during the course of it are to be admitted in evidence as proof of guilt. Moreover, it is inherently unfair for the government to engage in such activity, only to use it as a weapon against the defendant when negotiations fail."

*United States v. Ross* (5th Cir.1974), 493 F.2d 771, 775.

■ In *Moulder,* the sheriff testified to Moulder's statement to him that the prosecutor had refused to take his offer to plead guilty to manslaughter. As in *Moulder,* the offer made by Martin was a "plea bargaining communication" and therefore inadmissible, in spite of its character as an overture to plea bargain negotiation. Other jurisdictions have held that such "unsolicited offers" are included within the meaning of plea discussions. In *People v. Friedman* (1980), 79 Ill.2d 341, 38 Ill.Dec. 141, 403 N.E.2d 229, the defendant had called an investigator for the attorney general's office and inquired about "making a deal." The court held that under its court rule 402(f), making "plea discussions" inadmissible, it is not an essential element of a plea discussion that the statement sought to be excluded be made "as an integral part of a bona fide negotiation." The Sixth Circuit held in *United States v. Brooks* (6th Cir.1976), 536 F.2d 1137 that even an attempt to open plea bargaining should be covered under the same rule of inadmissibility as that applied to plea negotiations with the prosecutor.

Furthermore, the fact that a law enforcement officer, rather than the prosecutor, was the recipient of the offer is of no consequence. In the first place, *Moulder* does not so limit the rule, which includes "any communication relating to the plea bargaining process." *Moulder, supra,* 289 N.E.2d at 528. Moreover, we agree with courts which have encountered the issue and concluded that the defendant's perception of an official's authority to plea bargain is relevant. *See, People v. Friedman, supra,* (defendant could have reasonably assumed that an investigator for the attorney general's office was an appropriate party to whom he could convey his offer to bargain); *United States v. Herman* (5th Cir.1977), 544 F.2d 791 (where defendant made plea offer to postal inspectors, the defendant's perception of the official's negotiating authority is the relevant factor.)

In the instant case, Officer Davies actually questioned Martin about the proposed terms of his offer and apparently explored the possibility of an arrangement. Police officers are frequently the recipients of such offers for leniency, and we believe such communications fit squarely within the rule announced in *Moulder.* In this regard, *Crandell v. State* (1986), Ind.App.,

490 N.E.2d 377, 381 is inapposite. In that case we held that the privilege would not extend to communications between the attorney representing the defendant, and the victim, in which Crandell offered to apologize to the victim, or leave the county, if the victim would "keep him out of jail." Crandell did not offer to plead guilty in exchange for favorable treatment from the State nor could Crandell reasonably assume that the victim had negotiating authority.

The testimony of Officer Davies regarding Martin's offer was inadmissible, and it was error for the trial court to admit it.

■ The State's only argument is that the error did not place Martin in a position of "grave peril." Where the defendant has moved for a mistrial, the court must determine whether the error placed the defendant in a position of grave peril to which he should not have been subjected. *White v. State* (1971), 257 Ind. 64, 272 N.E.2d 312. In *Hill v. State* (1979), 271 Ind. 86, 390 N.E.2d 167, the supreme court acknowledged that, in determining whether improperly admitted evidence placed the defendant in a position of grave peril, the court must consider whether the evidence had a substantial effect on the jury's verdict. *Id.* 390 N.E.2d at 170.

"[I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." *Kotteakos v. United States*, (1946) 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557, 1566-7.

*Id.* 390 N.E.2d at 170-71. In *Hill*, the prosecutor's displaying a shotgun to the jury was found to have little impact, where several witnesses had testified to the fact that defendant was carrying a shotgun, and the case was not one with "strong evidence on both sides." Similarly, the effect of the prosecutor's characterizing defendant as "the ringleader" of a group of robbers was held to be slight when there was competent evidence before the jury that the defendant was in fact the leader of the group. *Evans v. State* (1975), 163 Ind. App. 351, 323 N.E.2d 672.

■ The impact of the error in the admission of the evidence in the instant case is not so easily assessed.[1] We may not

---

1. Admission of evidence that a defendant has pleaded guilty and subsequently withdrawn the plea is so prejudicial as to constitute reversible error. *Kerchevel v. U.S.* (1927), 274 U.S. 220, 47 S.Ct. 582, 71 L.Ed. 1009. Since *Kercheval,* many jurisdictions have ruled that the erroneous admission of statements made during plea negotiations, or offers to plead guilty is reversible error. *Moulder, supra; People v. Friedman, supra,* (reversible despite overwhelming evidence of defendant's guilt; the court has recognized the devastating effect of such testimony); *United States v. Brooks* (6th Cir.1976), 536 F.2d 1137 ("we cannot say that admission of appellant's offer was harmless"); *United States v. Smith* (10th Cir.1975), 525 F.2d 1017 (receipt of this evidence was substantial error which requires reversal); *United States v. Ross* (5th Cir.1974), 493 F.2d 771, 775.

The rule against admissibility also encourages the "negotiated disposition of criminal cases through elimination of the risk that the accused enter plea discussions at his peril." *Friedman, supra* 38 Ill.Dec. at 147, 403 N.E.2d at 235. *Also Moulder, supra; Brooks, supra.* Generally,

while courts note the highly prejudicial nature of testimony regarding a defendant's offer to plead guilty, few engage in a particularized analysis of the error's impact on the verdict in the case. (The parenthetical notes following the cases above are the sole references to harmless error.) Whether the nearly unanimous and unequivocal reversal rate in these cases signals the emergence of a rule which would make such error automatically reversible is unclear. Equally unclear is upon what theoretical basis such a *per se* rule would rest.

The majority of the Supreme Court does not appear receptive to such an automatic rule of reversal where nonconstitutional errors are involved. *United States v. Lane* (1986), 474 U.S. 438, 446, n. 9, 106 S.Ct. 725, 730, n. 9, 88 L.Ed.2d 814. The court held in *Lane* that misjoinder under Fed.R.Crim.P. 8(b) is subject to harmless-error analysis and is not reversible error *per se.*

However, Justice Stevens, joined by Justice Marshall, concludes that some non-constitutional errors should not be subject to a harmless error standard. Stevens suggests that harmless

conclude that the error was not prejudicial merely because we are convinced that the evidence is sufficient to sustain the verdict of guilty. *Hill, supra, citing Kotteakos v. United States* (1946), 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557. We also observe that Martin's plea bargain offer was not merely testified to and then stricken from the record; rather, because the trial court ruled the offer admissible, the jury was permitted to hear the details of the offer, and the officer's reaction to it. The "likelihood of prejudicial impact is greater where the jury is permitted to consider the evidence rather than admonished to disregard it." *Morris v. State* (1979), Ind.App., 397 N.E.2d 1056, 1058.

From our careful review of the record, we conclude that, although Martin's entrapment defense was somewhat weak, a jury might have inferred from the evidence that Martin was not predisposed to selling drugs. Martin testified that he had never sold drugs before White set up the two sales. White knew Martin used Dilaudid, but had not seen Martin sell drugs before August 5, 1986. R. 144. Allison testified that White told him Martin was someone he had made contact with and that Martin was a steady user and "had some connections along those lines." R. 120. Also, Martin did not have Dilaudid in his possession, but on both occasions had to leave the trailer to obtain it. To reiterate, although there was sufficient evidence to support the verdict, such as Martin's knowledge of the price of Dilaudid and his willingness to acquire Dilaudid in the future, contrary evidence may have left the jury with some doubt as to whether Martin was predisposed to selling Dilaudid. *See Gitary v. State* (1987), Ind. App., 503 N.E.2d 1241, 1244 (factors relevant to predisposition).

Also, by White's testimony regarding his proposal to become an informant for police, the jury was informed of the practice

whereby one guilty of a drug offense might obtain favorable treatment in exchange for his supplying information on other drug offenders to police, the very "deal" the jury heard Martin was attempting to strike with Officer Davies. This testimony may have magnified the prejudicial effect of Officer Davies' testimony.

After considering all the evidence at trial, we are not assured that the error had but slight impact on the verdict. Martin was placed in a position of grave peril by the testimony's admission. Therefore, we must reverse.

Reversed and new trial ordered.

RATLIFF, C.J., and SULLIVAN, J., concur.

error analysis is inappropriate when any of three situations exists: 1) when it is clear that a statute or rule was not intended to be subject to such a rule; 2) when an independent value besides reliability of the outcome suggests that such analysis is inappropriate; and 3) when the harmlessness of an error cannot be measured with precision.

Under Justice Stevens' analysis, a rule of automatic reversal might take into account the futility of a rule fostering open plea bargain negotiations where admission of any statements would likely be found harmless in a particular case under *Kotteakos*.