## Dalton v. Commonwealth.

(Decided November 5, 1926.)

### Appeal from Rockcastle Circuit Court.

1. Homicide.—Evidence held to sustain conviction of manslaughter.
2. Criminal Law.—Credibility of witnesses is for jury.
3. Criminal Law.—Conviction cannot be set aside, unless palpably against evidence.
4. Criminal Law.—Instruction was not erroneous as ignoring homicide's defense, when instructing to acquit, if killing was under circumstances set forth in another instruction embodying defense.
5. Criminal Law.—Bill of exceptions, showing objection and exception, and overruling objection to argument of prosecutor, is bind-

ing, though record discloses that in motion and ground for new trial defendant admitted that he did not object at the time.

6. Criminal Law.—Argument of prosecutor for murder that "this is the worst case I ever saw—this is deliberate, premeditated assassination," held not misconduct, in view of evidence.

7. Criminal Law.—Argument of prosecutor that defendant obtained warrant for deceased to have an excuse to kill him was not prejudicial, under Criminal Code of Practice, section 340, where jury knew from evidence statement was untrue.

8. Criminal Law.—Commonwealth's attorney must present his cause fairly without improper deductions from evidence and is in duty bound to acquit innocent as well as convict guilty.

C. C. WILLIAMS and S. D. LEWIS for appellant.

FRANK E. DAUGHERTY, Attorney General, and B. J. BETHURUM for appellee.

OPINION OF THE COURT BY JUDGE DIETZMAN—Affirming.

The appellant was convicted of the crime of manslaughter and sentenced to confinement for a period of five years. From the judgment he appeals.

He urges three grounds for reversal: (a) That the verdict is flagrantly against the evidence; (b) errors in instructions; (c) misconduct of the special prosecutor for the Commonwealth in his closing argument. The first of these grounds necessitates a summary of the evidence.

The appellant is a deputy sheriff of Rockcastle county. Some two years before the homicide occurred out of which this prosecution arose, the appellant, who was then a deputy sheriff, undertook to arrest Otis Wynn for some misdemeanor. Wynn attempted to escape and the appellant fired his revolver four times, it being in dispute whether at Wynn or into the ground. At all events the appellant was required to resign as deputy sheriff on account of this shooting, but was some time later reappointed to that office. Wynn, who was a young boy inclined to be a harum-scarum and to be mixed up more or less in bootlegging activities, but who was not, so far as this record shows, a dangerous boy, seems to have resented being thus fired upon by the appellant as he thought. The record overwhelmingly establishes that Wynn on numerous occasions just previous to the difficulty in which he lost his life, and for which appellant was convicted, stated that he never intended to be arrested by appellant.

Probably the reason for these statements on Wynn's part at this time was the fact that a warrant against him for some bootlegging activity had been issued and was in the hands of appellant for service. After this warrant had been issued, Wynn left Rockcastle county for parts unknown and the appellant returned the warrant unserved to the court which had issued it. After a while Wynn returned to Rockcastle county and seems to have made inquiry among his friends as to how best to settle the trouble for which the warrant had been issued, especially inquiring how much it would cost him so to do. This talk in the community evidently came to the ears of the appellant, for a few days before the killing of Wynn, the appellant, who happened to be in the office of the county judge of Rockcastle county on other business, inquired of the county judge, as the latter testifies, how much it had cost Wynn to settle his trouble. It is very evident that appellant then thought that Wynn had settled the matter. The county judge informed appellant that Wynn had not settled the prosecution and asked appellant what he had done with the warrant which had been delivered to him for service. The appellant replied that he had returned it unserved, and the county judge then said that he would get it and that the appellant should serve it. The county judge did immediately procure the warrant from the files and turned it over to the appellant for service. A day or so thereafter the appellant was riding his horse on the highway towards a little village named Conway. Wynn and a companion passed him in an automobile going in the opposite direction, but appellant says that he did not recognize Wynn until after Wynn had passed him, for which reason he did not stop the automobile and arrest Wynn then. Before appellant got to Conway, Wynn and his companion repassed the appellant going in the same direction, but appellant says he did not recognize either of them on this occasion. Wynn and his companion went on to Conway, and, on arriving there, Wynn went over to a garage in which was an automobile belonging to him. This automobile was in the back part of the garage. Wynn immediately went to work on his machine, fixing some punctured tires. There were then present in the garage Park Thomas, who was also working on a car; Grant Riddle, who owned the garage, and George Wren, who happened to be there at the time. Shortly thereafter the appellant rode up to the railroad station at Conway, tied his horse, attended to

some mail and then walked over to the garage. As he entered the front door, he accosted Riddle and Wren in a friendly manner, walked to the back part of the garage where Wynn was working, and said something to him. Up to this point it can fairly be said that there is no dispute in the testimony as to what had occurred, but from here on the testimony conflicts. There were only three witnesses besides the appellant who undertook to say what happened in the garage. Park Thomas in substance testified that as the appellant walked to the back part of the garage he (Thomas) glanced over his shoulder and saw appellant approach Wynn and say something; that he (the witness) then turned his head and went on working at his machine and that the first thing he knew there was a shot fired. He looked up and saw appellant and Wynn scuffling over a revolver, and he thereupon made his exit at once from the garage. Riddle testified in substance that when the appellant got back to where Wynn was working, Wynn raised up and leaned back against the side of his machine; that the appellant took hold of him by the breast and said something and then pulled his revolver from under his arm and shot Wynn; that at the time Wynn was shot he was standing by the side of his car with his hands down by his side; that it looked as though the boy was trying to back away from the appellant when appellant fired upon him; and that Wynn never made any move before he was shot except his effort to get back against the car; that, when this shot was fired, Wynn seized the pistol which appellant had in his hand and began scuffling for the possession of it, whereupon appellant called to Wren for help. At this point this witness, too, made his exit from the garage and hastened to his father's house about fifty yards away. Just as he entered the back room of his father's house, he heard a second shot fired. The witness, George Wren, testified in substance about the same as Riddle. He said that when the appellant approached Wynn the latter raised up, looked over his shoulder and smiled; that his hands were down at his side; that the appellant then grabbed the boy and in an instant the pistol was fired; that the boy was just standing there when the appellant fired upon him; that immediately after the first shot the two began scuffling for the pistol; that appellant then cried to Wren to help him and deputized the witness to assist him in the arrest; that he approached the two and told appellant that he could not help him, and then,

seeing the scuffle for the pistol was becoming hotly contested, he too made his exit from the garage. He also testified that in a little while after he got on the outside he heard the second shot, and then appellant emerged from the garage. It is practically admitted that the first shot which was fired made a flesh wound in Wynn's head. The second shot entered towards the back of the head, instantly killing Wynn.

For himself appellant testified that when he got back to where Wynn was working he told Wynn that he was under arrest; that he then took Wynn by the arm, whereupon Wynn drew a pearl-handled revolver from his hip pocket; that he (appellant) then drew his gun and fired the first shot; that Wynn dropped his pearl-handled revolver and began to scuffle with the witness for the possession of the latter's revolver; that he called upon Wren for assistance but never got it, and that after everybody had run out of the garage and while he and Wynn were still scuffling, the latter turned loose of the witness' revolver and bent over to get the pearl-handled revolver which had fallen to the ground; and that then the witness shot him the second time, hitting him in the back of his head because of his stooping position.

It is obvious from this statement of the evidence that this was a case for the jury. If the testimony of Riddle and Wren be believed, there was little, if any, excuse on the part of appellant for firing his revolver the first time. They say that Wynn was simply standing by his machine smiling, with his hands down at his side and making no demonstration whatever when appellant shot him. Of course, if the appellant's testimony be believed, he made out a clear case of self-defense. But the credibility of witnesses is for the jury, and its verdict cannot be set aside unless it is palpably against the evidence. Winchester v. Commonwealth, 210 Ky. 685, 276 S. W. 575; Deaton v. Commonwealth, 211 Ky. 651, 277 S. W. 1001. Such is not the case here.

So far as ground (b) is concerned, appellant says in his brief that instruction No. 1 is defective because it is the regular instruction in a murder case and wholly ignores the appellant's defense based on his being compelled to kill the deceased in the effort to arrest him. Appellant is in error in this contention because, although instruction No. 1 is the regular murder instruction, it also specifically states that the jury should not find the

appellant guilty if he killed the deceased under the circumstances set forth in instruction No. 5, which embodies the defense of the appellant above mentioned. Regarding this instruction No. 5, though, the appellant says:

"We submit that instruction No. 5 does not go as far as it should to fully safeguard the rights of the appellant."

This is all the argument he offers us as to its insufficiency. We have carefully read it, and it appears to us to safeguard the rights of the appellant as strongly as could have been done.

Lastly, it is contended that the special prosecutor was guilty of misconduct in his closing argument. We may say, in passing, that the record discloses that in the motion and grounds for a new trial the appellant admits he did not object to the now complained of argument at the time it was made; but in the bill of exceptions it appears that appellant did object and except at the time and the court overruled his objection. As we have so often written in a matter of this kind, we are bound by what appears in the bill of exceptions, and cannot take cognizance of what appears in the motion and grounds for a new trial. Jent v. Commonwealth, 209 Ky. 59, 272 S. W. 29. The argument complained of was this:

"This is the worst case that I ever saw in a courthouse. This is a deliberate, premeditated assassination. The defendant rode to Mt. Vernon to get the warrant for the deceased in order to have an excuse to kill him."

We believe the special prosecutor had a right to make the first two statements. It was simply an expression of an opinion on his part to the effect that the evidence established an unwarranted killing. He was prosecuting appellant for this very crime, and, if his evidence is to be believed, there was a good deal of foundation for the statements he made. They are perhaps a little strong, but juries take into consideration the heat of counsel engendered by the struggle of contest. It is true that there was no evidence to support the statement that the appellant rode to Mt. Vernon to get the warrant for the deceased in order to kill him, and, were the evidence silent as to what did happen on this point, we might be inclined to reverse this case because of the injection into the evi-

dence before the jury of purported facts which did not exist, and the truth of which statement the jury could not test by anything they had before them. But in the case before us the county judge had testified that it was he who solicited the appellant to serve this warrant; that the appellant had come to his office on other business and under the impression that Wynn had compromised his difficulty. Therefore, although this statement of the special prosecutor was untrue, the jury, from the evidence it had before it, must have known that it was untrue and was not influenced by it. The verdict also demonstrates this because if the special prosecutor had been correct in what he said in this complained of argument and the jury so believed, they could not have well acquitted the appellant of murder and convicted him of manslaughter as they did. We do not wish to be understood as giving our seal of approval to what the special prosecutor did here, for, as stated in the case of. Mount v. Commonwealth, 120 Ky. 411, 86 S. W. 707, the Commonwealth's attorney should always remember that he is a *quasi* judicial officer who seeks to do justice, equally and impartially, and whose duty it is to see that the innocent go acquit as much as it is to see that the guilty man is convicted. It is his duty to present his cause fairly and not impress upon the jury any deduction that is not from the evidence strictly legitimate. But section 340 of the Criminal Code precludes us from reversing any judgment where we cannot say that the error complained of was prejudicial to the substantial rights of the appellant, and, as pointed out above, we cannot say that the argument in this case was prejudicial to any substantial rights of appellant.

As none of the grounds for reversal relied on herein are meritorious, the judgment of the lower court is affirmed.