## East v. Commonwealth.

(Decided May 5, 1933.)

B. J. BETHURUM for appellant.

BAILEY P. WOOTTON, Attorney General, and FRANCIS M. BURKE, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

At about 8 o'clock p. m. on July 27, 1932, in front of a country church in Pulaski county, the appellant, Dick East, shot and killed Murphy Johnson. He was later indicted by the grand jury of that county charged with murder and on his trial he was convicted of voluntary manslaughter and punished by confinement in the penitentiary for seven years. On this appeal from the verdict and the judgment pronounced thereon three grounds are urged for a reversal, although a number of others are contained in appellant's motion for a new trial which the court overruled. Those others are expressly abandoned in brief of counsel for appellant, and which we are convinced was the correct course, since the record discloses they were and are without merit.

The three grounds argued in brief of appellant's counsel are: (1) The rejection of competent evidence offered by defendant; (2) repeated propounding of incompetent questions to witnesses by prosecuting counsel after the court had ruled that the testimony sought to be obtained was incompetent; and (3) erroneous and prejudicial remarks by the commonwealth's attorney in his closing argument to the jury. Before discussing and disposing of either of them, we deem it proper to make a brief and condensed statement of the general facts for the purpose of explaining our ultimate conclusion hereinafter stated concerning the merits of the argued grounds.

The killing occurred on a Wednesday night and a protracted meeting was being conducted in the church by a minister named Godsey. It began on the Sunday night previous. Appellant and his two brothers, Jim and Tom East, lived in the neighborhood and attended the services. Other attendants were the deceased and two brothers, and "Bunk" Hardwick and three of his sons. It was claimed that appellant, on some of the prior evening services, had disturbed the congregation and some one swore out a warrant for his arrest on that charge. It was arranged for a deputy sheriff by the name of Brown to execute the warrant by arresting appellant on the night of the shooting. Brown resided

several miles from the church and on Wednesday afternoon at about 4 o'clock he appeared at the home of Hardwick where he remained until after supper and then walked with him and the members of his family, including the three sons, to the church, arriving there somewhere near 7:30 p. m. The preponderance of the testimony shows that Hardwick carried along with him his pistol, and expressed a willingness to aid and assist Brown in the execution of the warrant if his services were needed. It was shown that the Hardwick boys or some of them were also armed, but whether they became so equipped after they arrived at the church or before they came, is not clear. Within a brief time after the deputy sheriff and the Hardwicks arrived at the church some one informed him that Tom East, a brother of appellant, and the deceased, Murphy Johnson, were at the side of the church building engaged in a quarrel. Whereupon he approached them with Bunk Hardwick following him with his pistol in his hand. The officer admonished the participants in the heated argument to desist and to "Cut it out" or he would arrest them. Tom East then cursed the officer and told him to come no further or he (East) would kill him. About that time Bunk Hardwick fired two or more shots at Tom East, followed by others from the deputy sheriff, several of which took effect in his body and from which he later died. But before falling he fired several shots at Hardwick and the officer, hitting both of them and wounding them quite seriously. The officer crawled away in the darkness and was later found lying at the root of a tree, but Hardwick was not so disabled and he turned with his pistol on Jim East who had arrived in his automobile with his family about that time, and threatened to shoot him, and, according to the testimony of a number of witnesses, he actually fired his pistol at him. Mrs. Jim East, with a young baby in one arm, then grabbed Hardwick's pistol and begged him to not shoot her husband, as did the latter also, stating at the time that he was not armed. Such appeals, however, did not assuage the belligerent attitude of Hardwick, and Jim East joined his wife in her efforts to disarm him. In the meantime the parties had gotten from the side of the church where the first encounter occurred to its front where another battle occurred in which Murphy Johnson lost his life.

Appellant arrived at the church that night at an early hour and was in the building at the commencement of the services which had already begun when the first fight occurred in which Tom East lost his life. Three or four hymns had been sung before that fight commenced. Some horses were hitched at the immediate rear of the church building, one of which was appellant's. They were producing some noise to the disturbance of the preacher and the congregation, when he requested their owners to retire and remove them, and appellant was engaged in complying with that request when the first battle occurred. In returning from performing that task he passed by the prostrate body of his brother Tom, who was still alive and able to talk, and he picked up the pistol of his brother lying nearby and went around to where the second battle was in its formative stage. He inquired of Bunk Hardwick, who was yet belligerent, if he had shot his brother and he received a negative reply, with the statement that the deputy sheriff was the one who had done so. Appellant at that time had in his hand his brother's pistol and he and Hardwick agreed to make peace but as appellant turned to go away, Hardwick commenced firing upon him with one shot striking and wounding him. He then started to turn when his brother, Jim East, remarked: "Lookout Dick, Murphy Johnson is going to kill you." Immediately deceased shot appellant, inflicting another wound on his body, and that shot was followed by others, but almost instantly after being wounded by Johnson appellant turned and shot him one time, producing instant death.

The testimony heard at the trial fills some six or seven hundred pages of the record, and like all similar cases there are many contradictions found therein. The commonwealth introduced some eight or ten witnesses, who stated that Murphy Johnson had no pistol when he appeared upon the scene of the second battle in which he was killed, but a much greater number of witnesses testified that he did have one and fired it at the appellant as above stated. Some of the witnesses for the prosecution also stated that Jim East did call to appellant and warned him concerning the efforts of deceased to kill him as above indicated. It is also quite conclusively established that the pistol that the deceased had at that time was the one that belonged to the deputy

sheriff and which had been procured by one of the Hardwick boys and delivered to the deceased with the remark, "Go to it Murphy."

The warrant above referred to was not produced, nor was there any evidence of its contents, nor any proof of its charges or the facts upon which they were based, but which latter, perhaps, would have been improper. There were also some proven threats against appellant, made by both the deceased and Bunk Hardwick, and the evidence as a whole largely preponderates in favor of appellant's urged right of self-defense; but not to the extent of authorizing us to declare that the verdict denying it was flagrantly against the evidence; since, if the witnesses for the prosecution told the truth, the homicide was unjustifiable. In the light of the above brief summary of the testimony we will now proceed to dispose of the three grounds urged for reversal, determining them in the order named.

1. The only rejected evidence complained of under ground 1 was the refusal of the court to permit Bunk Hardwick, while on the stand as a witness for the commonwealth, to state that he was under indictment for killing Tom East. We think it requires no argument to show that the court did not err in excluding that testimony. The activities and belligerent conduct of Bunk Hardwick were before the jury, and the fact of his being indicted for a separate and distinct crime was wholly immaterial upon the trial of appellant who stood charged with another crime wholly distinct from the one for which Hardwick was indicted. Neither was the evidence competent to impeach the credibility of Hardwick, since by the express provisions of our Civil Code of Practice (which is also applicable to criminal trials), section 597, expressly enacts that a witness may not be impeached "by evidence of particular wrongful acts, except that it may be shown by the examination of a witness, or record of a judgment, that he has been convicted of felony." We, therefore, conclude that this ground is without merit.

2. The facts forming the basis for ground 2 are: That Hardwick had once been a deputy sheriff of Pulaski county, and, while such, made a number of arrests in his neighborhood for various infractions of the law, most of which, if not all of them, were misdemeanors. Prosecuting counsel asked one of the witnesses for de-

fendant if he did not entertain bad feelings toward Hardwick because the latter had arrested him while he was acting as deputy sheriff. The court declined to permit the witness to answer and that question, in substance, was propounded to two or three other witnesses introduced by defendant, and it is of such repeated questions that counsel complains under this ground. Technically, the questions should not have been propounded to the subsequent witnesses after the court had ruled upon its competency, but we are not prepared to say that counsel's conduct in doing so prejudicially affected defendant's rights. Of course, cases might be presented where counsel so disregarded the ruling of the court in such a manner, and to such an extent, as to produce a prejudicial effect upon the rights of the adverse litigant, but we are persuaded that the conduct of counsel in this case did not reach that point, and for which reason we conclude that this ground is likewise without merit. But in doing so we would not be understood as approving such a course.

3. Ground 3 presents a more serious question, and one that has been presented and elaborated upon by us in a vast number of cases in which we have clearly outlined the broad road upon which prosecuting counsel may travel in performing that part of his duty of arguing the case to the jury. We have attempted in prior cases to point out clearly the rights of counsel in that respect, as well as the limitations thereon, and it would seem that they should be clearly understood by this time. We have said repeatedly that, in making such arguments, counsel had the right, and it was his duty to present to the jury the facts as testified to by the witnesses, and to deduce therefrom all conclusions legitimately to be drawn from the testimony, to the end that the guilty might be punished and the enforcement of the law upheld and produced. At the same time we have as emphatically said, likewise repeatedly, that it was no part of the duty of prosecuting counsel to vilify and abuse a defendant on trial, nor counsel representing him; nor did such counsel have the right to argue facts for which there was no testimony to sustain, and which could in no sense be deduced therefrom; nor did they have the right to state in their argument facts nowhere appearing in the record, and which emanated alone from counsel making the argument. Neither has

such counsel the right to intentionally and knowingly misapply the instructions given by the court to the facts in the case so as to mislead the jury and cause its members to depart from the instructions and return a verdict not authorized thereby. Some of the many cases in which the rights and limitations of counsel in arguing cases to the jury were set forth by us in: Winkler v. Com., 229 Ky. 708, 17 S. W. (2d) 999; Johnson v. Com., 188 Ky. 400, 222 S. W. 106; Nash v. Com., 240 Ky. 691, 42 S. W. (2d) 898; Bennett v. Com., 234 Ky. 333, 28 S. W. (2d) 24; Goff v. Com., 241 Ky. 428, 44 S. W. (2d) 306; Allen v. Com., 145 Ky. 409, 140 S. W. 527; Bennett v. Com., 242 Ky. 377, 46 S. W. (2d) 484; Howerton v. Com., 129 Ky. 482, 112 S. W. 606, 33 Ky. Law Rep. 1008; Bailey v. Com., 193 Ky. 687, 237 S. W. 415; Bazzell v. I. C. R. Co., 203 Ky. 626, 262 S. W. 966; Little v. Com., 209 Ky. 263, 272 S. W. 721; Dalton v. Com., 216 Ky. 317, 287 S. W. 898; Johnson v. Com., 217 Ky. 565, 290 S. W. 325; Owensboro Shovel & T. Co. v. Moore, 154 Ky. 431, 157 S. W. 1121, 1123; Gunterman v. Cleaver, 204 Ky. 62, 263 S. W. 683; Clem v. Com., 213 Ky. 265, 280 S. W. 1104; Baker v. Com., 106 Ky. 212, 50 S. W. 54, 20 Ky. Law Rep. 1778. Others may be found in Key-Numbers 699 to and including 720 in volume 6 of West Kentucky Digest, under the title "Criminal Law." From a reading of them it will be found that this court (and which is in accord with all others) applies such rights, and limitations thereon, so as to harmonize with well-known and well-established traits of human nature and conduct.

In doing so we have held, under authority conferred by sections 338 and 756 of our Civil Code of Practice, and sections 340 and 353 of our Criminal Code of Practice, that an improper argument transgressing the limitations, supra, might, under the facts of a particular case, be sufficiently prejudicial to authorize a reversal of the judgment, when the same or a similar argument under a different state of facts might not be so. Illustrating the grounds for that distinction, a case might be presented where the proof of guilt was practically uncontradicted and where there was no occasion for the jury to be misled by the improper argument; while on the other hand the testimony adduced might be so pivotal in its convincing force and effect as that such an argument would cause the jury to swerve the

one way or the other and to arrive at its conclusion contrary to what it might otherwise have done, and which is the character of case we have here.

There are eleven different statements of counsel complained of under this ground, three of which are:

1. "Gentlemen, what is your estimate of the value of a human life? Your verdict will be the answer. Have you the moral courage to give this young buck (defendant) the punishment that he so richly deserves, or will you return into this courtroom with a verdict that will say to him, and to others, 'Go out again, and shoot, slay and murder, and come in here with a bunch of vultures and they will swear you out of it.'"

2. "I never had the pleasure of knowing Brother Godsey (meaning the witness, George Godsey, introduced as a witness for the Commonwealth); but my preacher brother has known him for years, and I have often heard him say that Brother Godsey was a righteous, God fearing, Soldier of the Cross, and I would rather believe what he swore from the witness stand as to believe a forty acre field full of painted face flappers like the defense has used here."

3. "Tom East, brother of the defendant, sought, and brought on the difficulty in which the deceased was killed, and I say unto you that having done that, under the law of this state, the defendant cannot claim the right to self defense, and you gentlemen cannot, and will not be justified in finding him not guilty."

It will be observed that argument 1 refers to defendant and his witnesses in very scurrilous and degrading terms, and for which there is no foundation in the record. If it were otherwise, such language might be held as nonprejudicial, notwithstanding it might be a departure from a circumspect and upright course as well as the most effective one. We conclude that the language employed therein was of such a nature as to produce prejudicial effect under the facts of this case, but which might not alone authorize a reversal of the judgment if this were the only argument complained of.

Argument 2 embodies not only testimony for the first time given at the trial by the attorney making the argument, but which testimony was and is pure unalloyed hearsay. Counsel therein testified to the good

character of the preacher as a witness for the prosecution, and which information was obtained from his brother whom he said in his argument was also a preacher. A great deal of the testimony in this case was directed to the point, as to whether that witness saw what he testified to (his testimony being strongly against defendant), and for the commonwealth's attorney to violate the rule so plainly laid down in the cases, supra, and to depart therefrom to the extent that he did in the language he employed, cannot escape criticism, nor may it be put aside in this case, under the circumstances developed, as being nonprejudicial, and which conclusion is abundantly sustained by our former opinions, to which reference has been made.

Argument 3 was and is a plain misapplication of the instructions that the court gave to the jury in this case. The self-defense instruction very properly contained no qualification, but this argument told the jury that defendant was not entitled to rely on his right of self-defense for what he did and the part he took in the second battle, if his brother, Tom East, fired the first shot at the commencement of the first battle, the two being wholly separate and distinct, defendant not even being present or seeing anything that occurred at the first one.

The prejudicial effect of that argument is more convincing when it is remembered that commonwealth's attorneys come in contact with the masses of the people as much or more so than does his honor on the bench, and possess their confidence to the same extent as does the presiding judge of the court. The sole defense of appellant in this case was that he committed the homicide with which he was charged in the exercise of his right of self-defense. The court in its instructions, as we have seen, placed no limitation on the exercise of that right; but the argument made by the commonwealth's attorney did do so, and the qualification so attached by him was without any support in law, even if it had been sanctioned by the court. Under the circumstances the jury may have and probably did accept the qualification of prosecuting counsel, and rejected appellant's only defense because thereof. The record furnishes abundant grounds for that conclusion, since there was much testimony to show that Tom East fired the first shot in the first battle and likewise a preponder-

56

ance of testimony showing that appellant did not fire the first shot in the second one. We deem it unnecessary to further elaborate upon the question or to extend the discussion in setting forth our reasons for our conclusion, since we are persuaded that even a layman would not take issue therewith.

We regret exceedingly to be compelled to reverse a verdict reached after a long trial as this one was, for improper argument of prosecuting counsel; but our duty is no different from that of prosecuting attorneys, and which is to see that the law is enforced, the guilty punished after a fair and impartial trial conducted according to the rules prescribed for that purpose, as well as to see that the innocent is not improperly punished. If counsel would but observe the rules, supra, so frequently and continuously indorsed and applied by this and other courts, it would save much time and cost as well as render their services more effective. Nothing is gained by vituperative abuse, nor is respect for the law generated and enhanced by misrepresentation of fact. Every record where the evidence is contradictory furnishes abundant ground for counsel to travel in the road so frequently marked out, effectively and with honor and distinction to themselves without incurring the hazard of having to perform their labors anew and to shoulder the responsibility for the increased cost in both time and expense. The road so outlined is not so encompassed or narrowed as to make it difficult to travel, since it will be observed that it is broad enough to allow counsel to vigorously comment on all testimony pointing to the defendant's guilt, and to draw all legitimate deductions therefrom, as well as to emphasize the elevating effect upon society of law observance, and the destructive effect of its infractions, and which furnishes abundant opportunity for displaying all the eloquence and logic that may be needed for the entertainment of the listening multitude. Under our former opinions we see no escape from the conclusion that the arguments complained of, especially Nos. 2 and 3, were so prejudicial to the rights of defendant as to compel us to reverse the judgment therefor.

The brief for the commonwealth in this case, and which was prepared in the office of the Attorney General, coincides with what we have said concerning this ground by employing this language: "We hold no brief

for such conduct on the part of Commonwealth's Attorneys and such flagrant disregard of the rights of a fellow lawyer and the record, as is shown by the argument in this case, deserves and should receive the prompt condemnation of the trial judge. This court has condemned, repeatedly, similar conduct of Commonwealth's Attorneys. Commonwealth's Attorneys are given a wide latitude in the argument of cases and if they would observe the repeated admonitions of this Court as to their duty in the argument of cases, the Commonwealth would be saved unlimited cost and the Attorney General's office and this Court would be saved the task of dealing with such questions.''

Wherefore, the judgment is reversed, with directions to sustain the motion for a new trial, and for proceedings consistent with this opinion.