RENDERED:  OCTOBER 28, 2021
TO BE PUBLISHED

# Supreme Court of Kentucky

2020-SC-0114-MR

MARTICE N. MCRAE                              APPELLANT


V.                    ON APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE BRIAN C. EDWARDS, JUDGE
NO. 17-CR-003781


COMMONWEALTH OF KENTUCKY               APPELLEE



**OPINION OF THE COURT BY JUSTICE HUGHES**

**<u>AFFIRMING</u>**

Appellant Martice McRae was tried and convicted by a Jefferson County jury for the murder of Justin Hague.  He claims that the trial court erred by: 1) granting a partial Fifth Amendment privilege to a witness, 2) overruling McRae's objection to the Commonwealth's closing argument, 3) allowing a detective to narrate videos about which he had no personal knowledge, and 4) denying McRae the opportunity to recross-examine the same detective regarding testimony first provided during his redirect examination.  Upon review, we affirm the trial court's judgment.

**<u>FACTUAL AND PROCEDURAL BACKGROUND</u>**

Justin Hague was found late in the evening on July 25, 2017, lying face down in a pool of blood alongside the road on Carolyn Way.  He died shortly thereafter at an area hospital from a single gunshot wound to the head.  A few

months later, Martice McRae became a suspect in the murder. Testimonial and video evidence established a timeline of Hague's interaction with others, including McRae, on the night of his murder. The Commonwealth presented proof that McRae drove Hague from his home on Norene Lane to Carolyn Way, where McRae shot Hague while he was in the front passenger seat of a stolen blue Chevy Sonic. McRae then pushed Hague out of the car and drove away.

Hague, who lived in his parents' basement and struggled with drug addiction, was at home about 7:30 p.m. that night. Around dusk, Hague and his friend, Doug, walked about a block away to Ryan's apartment, also on Norene Lane. When they left there, Hague told Ryan they would come back later. Hague and Doug then walked a short distance to Laundry Connection on Poplar Level Road where Hague spoke with a person who worked there. During that time, Doug left and returned driving his girlfriend's car. A video of the Laundry Connection visit was played for the jury.

Eventually, Hague and Doug both left the laundromat and Hague walked back to Ryan's apartment. Doug, driving to Hague's house, passed Ryan's apartment and saw Hague, two white men, and a black man standing outside. Doug waited at Hague's house.

About the time Hague returned to Ryan's apartment, Ryan was on the front porch with a neighbor, when a black man, who was unknown to Ryan at the time, walked up. The man, later identified as McRae, discussed buying drugs. Ryan noticed that McRae had a gun, which he thought was a .40 caliber. When Hague joined the three he asked Ryan to take him to Jeff's, who

2

lived on the same street. Ryan declined to do so at that time, but McRae offered to give him a ride. Ryan described the apartment video surveillance showing the group's interaction in front of his apartment. According to Ryan, Hague left with McRae in a small dark-colored car.

Late that evening was the last time Michael Hague, Hague's father, saw him alive. The garbage can in front of their house was hit and knocked over by a small dark-colored sedan. Michael last saw Hague picking up trash and putting it back in the can and then leaving in the dark-colored sedan. Investigators were unsuccessful at that time in identifying the man Hague left with that night.

A few months later, the investigators received a lead from Deonta Thorn which led to the arrest of McRae for killing Hague. During a police interview, Thorn provided details about a conversation with McRae in which McRae admitted killing a white guy. Thorn stated that he saw and spoke with McRae the day after the murder. McRae told Thorn that the white guy had tried to rob him, and then McRae shot him in the head and pushed him out of the car they were in. On the way to taking McRae to clean that car, Thorn drove by the shooting scene on Carolyn Way where he saw blood on the ground. Later, he saw blood in the car McRae and the victim had occupied.

Thorn also made statements during the interview about possessing a gun that he transferred to McRae, statements that incriminated Thorn since he was a convicted felon. Thorn told police he provided a .40 caliber Smith and Wesson to McRae, the same gun McRae used to shoot the victim. As discussed

3

below, when Thorn's counsel later claimed that this testimony would incriminate Thorn, the trial court ruled that Thorn could not be asked questions about his personal possession of guns, protecting his Fifth Amendment right against self-incrimination.

At trial, the Commonwealth questioned Thorn about the interview where he provided information about a murder McRae committed in the summer of 2017. Because Thorn was non-responsive to the questioning, the trial court allowed the Commonwealth to treat him as a hostile witness. The specific statements which Thorn claimed he did not recall making included: he knew from a conversation with McRae that McRae shot a white guy in the head; that he, Thorn, had seen the place where the victim was shot and pushed out of the car; that he went with McRae to see the car the victim was shot in; that the car had blood on the window, the windshield, and on and all around the passenger seat; that he thought the car was a stolen gold Camry; that he knew what kind of gun McRae used to shoot the white guy, a .40 caliber, black and silver, Smith and Wesson; and that he knew the man to whom McRae later sold the gun. In keeping with the trial court's ruling, the Commonwealth did not ask Thorn about his prior personal possession of the gun. Given Thorn's lack of cooperation and failure to recall his prior statements to the detectives, the Commonwealth was allowed to impeach him by playing his videotaped police interview during the trial testimony of one of the detectives. The Commonwealth and defense reviewed the video prior to playing it for the jury

4

and removed Thorn's incriminating statements about his prior possession of the gun.

The jury also heard testimony from William Morrell and Juvon Foster. Morrell testified that he was incarcerated with McRae and during that time McRae told Morrell that he had committed Hague's murder. Foster's videotaped police interview was played for the jury. During that interview Foster said that he purchased a black and silver .40 caliber gun from McRae and he identified McRae as the black man in a still photo taken from the Norene Lane apartment surveillance video. Additionally, a blue Chevy Sonic with a vanity plate, reported stolen from a Circle K not far from the Norene Lane apartments on the night of the murder, was recovered during the investigation. The apartment video viewed by the jury showed McRae driving a Chevy Sonic with a vanity plate on the front. Trial testimony established that the DNA from blood found on the passenger's seat cushion of the Chevy Sonic matched Hague's blood.

McRae did not testify at trial but in a statement to police at the time of his arrest, McRae said that Hague got into his car on Norene Lane, he gave Hague a ride because he wanted to buy some drugs, and he dropped Hague off on Carolyn Way and then left. After a six-day trial, the jury convicted McRae of Hague's murder and recommended a sentence of fifty years in prison. The trial judge sentenced him accordingly and this appeal followed.

Other facts pertinent to McRae's arguments are presented below.

**ANALYSIS**

## I. The Trial Court Did Not Err by Granting a Partial Fifth Amendment Privilege to Witness Deonta Thorn.

When Deonta Thorn, a convicted felon, was arrested on charges unrelated to this case, he sought to benefit himself by sharing information about Hague's murder. Along with providing other information incriminating McRae in Hague's murder, Thorn told police that he had provided a .40 caliber Smith and Wesson to McRae and that McRae later told Thorn he had used the gun to shoot a white guy in the head and then push him out of the car. The Commonwealth called Thorn as a witness to testify at McRae's trial but Thorn's counsel expressed concern that Thorn could incriminate himself.[1] The Commonwealth stated it would not be asking questions implicating Thorn's Fifth Amendment right, while McRae suggested his questions on cross-examination could implicate Thorn's Fifth Amendment right. After a "dry run" hearing of the Commonwealth's and McRae's questions and Thorn's answers, the trial court ruled that the parties were not to question Thorn about his personal possession of firearms. McRae objected, stating the ruling violated his Sixth Amendment right to confront Thorn with the fact he personally possessed

---

[1] Thorn's earlier incriminating statements at the police station were not a bar to his invocation of the Fifth Amendment at trial. Kentucky has long recognized that even where a witness has made incriminating statements regarding a particular subject at an earlier place and time, the witness can still invoke the Fifth Amendment privilege when asked about those same matters under oath at trial. *See, e.g.,* *Commonwealth v. Phoenix Hotel,* 162 S.W. 823, 826 (Ky. 1914); *Galloway v. Commonwealth,* 374 S.W.2d 835, 836 (Ky. 1964).

6

the firearm at issue in this case and thus impaired McRae's ability to present his theory that Thorn was involved somehow in Hague's murder.

When Thorn testified at trial about the interview with police, he stated that a lot, if not all, of his statements were false and then, when asked about specific statements describing his knowledge of the crime and incriminating McRae, he repeatedly claimed that he could not remember making the statements in his interview with the detectives. The Commonwealth was allowed to play the video recording of Thorn's police interview for the jury during Detective Speaks' testimony.

McRae argues the trial court erred by granting Thorn a partial Fifth Amendment privilege because McRae was prohibited from confronting Thorn with the fact that he could identify the firearm due to his own prior possession of the gun.[2] The Commonwealth asserts that the trial court did not err, but if it did any error was harmless. We consider whether the trial court abused its discretion by compelling Thorn to testify to his knowledge of the crime, while prohibiting potentially incriminating questions about his gun possession. *Combs v. Commonwealth*, 74 S.W.3d 738, 745 (Ky. 2002).

---

[2] McRae complains that another unfair impact of this ruling was that it allowed the Commonwealth to impeach Thorn with his earlier statement to police that he could identify the gun used in the shooting. The record reveals that because Thorn repeatedly claimed he did not recall making statements during his interview with detectives, the Commonwealth moved to impeach him with the videotaped statements. McRae unsuccessfully argued that that the Commonwealth had not established a basis for the impeachment. While the issue may have been properly preserved, this argument is not adequately raised and addressed on appeal.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." Plainly, pronouncing a right against self-incrimination, the Fifth Amendment does not protect someone from incriminating others. However, if a defendant's cross-examination is restricted by the Fifth Amendment privilege of a witness, it may be necessary to strike or preclude the direct testimony of that witness. *Id.* at 743. While there may be circumstances in which a witness may properly invoke the Fifth Amendment against all questions material to another person's prosecution, this Court's jurisprudence includes cases for which an all-or-nothing approach to the invocation of the Fifth Amendment privilege does not apply. *Combs* distinguished *Clayton v. Commonwealth*, 786 S.W.2d 866 (Ky. 1990), and *Commonwealth v. Brown*, 619 S.W.2d 699, 703 (Ky. 1981), cases in which the witness indicated he would invoke the privilege as to all testimony. 74 S.W.3d at 742.

*Combs*, citing federal cases,[3] explains that under certain circumstances, including when the prosecution's "witness invokes the privilege as to one or

---

[3] In particular, *Combs*, 74 S.W.3d at 742 n.7, cites:

> *See* "Annotation: Propriety of Court's Failure or Refusal to Strike Direct Testimony of Government Witness Who Refuses, On Grounds of Self–Incrimination, to Answer Questions on Cross–Examination," 55 A.L.R. Fed. 742 (2001); *United States v. Curry*, 993 F.2d 43 (4th Cir. 1993); *United States v. Berrio–Londono*, 946 F.2d 158 (1st Cir. 1991); *United States v. Zapata*, 871 F.2d 616 (7th Cir.1989); *United States v. Humphrey*, 696 F.2d 72 (8th Cir. 1982), cert. denied 459 U.S. 1222, 103 S. Ct. 1230, 75 L.Ed.2d 463 (1983); *United States v. Nunez*, 668 F.2d 1116 (10th Cir. 1981); *United States v. Seifert*, 648 F.2d 557 (9th Cir. 1980); *United States v. Williams*, 626 F.2d 697 (9th Cir. 1980); *United States v. Demchak*, 545 F.2d 1029 (5th Cir. 1977); *Fountain v. United States*, 384 F.2d 624 (5th Cir. 1967), cert. denied 390 U.S. 1005, 88 S.

8

more of the defense's cross-examination questions (implicating the defendant's Sixth Amendment confrontation rights)" the witness need not be precluded from testifying. *Id.* The purpose of cross-examination is to test the accuracy and truthfulness, and thus the credibility, of testimony given by a witness on direct examination. *See Trigg v. Commonwealth*, 460 S.W.3d 322, 327 (Ky. 2015); *Combs*, 74 S.W.3d at 743 nn.10, 13 & 17 (citing *Lawson v. Murray*, 837 F.2d 653 (4th Cir. 1988)). As such, when the privilege is invoked by either a witness for the defense or the prosecution, the principle as to testimony preclusion is consistent. *Lawson*, 837 F.2d at 656 (citations omitted). Preclusion of the witness's testimony may be necessary "when refusal to answer the questions of the cross-examiner frustrates the purpose of the process [i.e., arriving at the truth]," *Combs*, 74 S.W.3d at 743 (quoting *Lawson*, 837 F.2d at 656), or stated another way, "frustrates cross-examination on issues material to the witness's testimony," *id.* at 744 (citing *United States v. Gary*, 74 F.3d 304, 310 (1st Cir. 1996)). The question then is whether the defendant's inability to examine the witness on certain matters prevents the defendant from testing the truth of the witness's direct testimony.

McRae contends that Thorn asserted his privilege against self-incrimination, seeking to avoid answering all questions like the witnesses in *Clayton* and *Brown*, and therefore, the trial court should not have allowed Thorn to be called as a witness. McRae views Thorn's assertion of his privilege

<hr>

Ct. 1246, 20 L.Ed.2d 105 (1968); *United States v. Cardillo*, 316 F.2d 606 (2nd Cir. 1963), cert. denied 375 U.S. 822, 84 S. Ct. 60, 11 L.Ed.2d 55 (1963).

against self-incrimination as frustrating his cross-examination on issues material to Thorn's testimony, i.e., Thorn's prior possession of the alleged murder weapon.

Almost twenty years ago, in *Combs*, this Court held that when a witness invokes his Fifth Amendment privilege, the trial court should decide through a "dry run" outside the presence of the jury whether the questions planned for the witness would result in an answer which may incriminate the witness. *Id.* at 745. The trial court in this case followed *Combs*' guidance but unlike in *Combs*, the trial court in its discretion determined Thorn could testify, concluding that Thorn's Fifth Amendment privilege was limited to questions about his personal possession of firearms.

McRae suggests that limiting the scope of his cross-examination of Thorn prejudiced his ability to test the truth of Thorn's testimony and, while the record indicates otherwise, that he was not able to attack Thorn's credibility regarding the benefit he sought in exchange for his testimony against McRae. Notably, Thorn never invoked his Fifth Amendment privilege while testifying before the jury and McRae fails to describe how being prohibited from asking Thorn about his prior possession of the alleged murder weapon otherwise impaired McRae's cross-examination of Thorn or kept him from exploring the alleged untruthfulness of Thorn's testimony implicating McRae in Hague's murder. As such, we conclude the trial court did not abuse it discretion by not precluding the entirety of Thorn's testimony.

10

## II. If Error, the Trial Court's Overruling McRae's Objection to the Commonwealth's Closing Argument Was Harmless.

Next, McRae claims that during the Commonwealth's closing argument another error occurred stemming from the trial judge's ruling that Thorn could not be asked about his prior possession of the alleged murder weapon. In particular, when the Commonwealth was describing Thorn's interview with the detective and his description of the gun McRae used, the Commonwealth stated, "How would [Thorn] have known the exact make, model, color of the weapon unless the killer told him?" McRae objected to this portrayal of the evidence, viewing it as taking advantage of his inability to cross-examine Thorn about his prior possession of the gun. The trial court overruled the objection.

McRae argues on appeal that he did not receive a fair trial because he was denied the opportunity to expose that Thorn knew the weapon's details from his own earlier possession of the gun rather than from the description provided by McRae. The Commonwealth views the prosecutor's comment as a reasonable interpretation of the evidence, but argues that if error occurred, it was harmless.

"The longstanding rule is that counsel may comment on the evidence and make all legitimate inferences that can be reasonably drawn therefrom." *Padgett v. Commonwealth*, 312 S.W.3d 336, 350 (Ky. 2010) (citing *East v. Commonwealth*, 60 S.W.2d 137, 139 (Ky. 1933)). The Commonwealth's preface to the comment objected to was that Thorn told the police, "He knows what gun McRae shot the victim with. It was a .40 caliber, Smith and Wesson, silver,

11

with a black handle." Upon McRae's objection, the Commonwealth pointed to the context of the challenged comment, namely how would Thorn have known what gun was used to shoot the victim.

In light of our conclusion that the trial court properly ruled that Thorn could testify, with all questions regarding his illegal gun possession to be avoided, we find the Commonwealth's comment falls within the bounds of proper argument. While Thorn may not have known the gun's details so well had he not previously possessed it himself, Thorn's police interview statements played for the jury revealed that McRae told him many details of the crime. But more importantly, McRae fails to advance an argument to show how the omission of this fact—Thorn's prior possession of the gun—rendered his trial unfair, particularly given the other proof of his guilt. *See Duncan v. Commonwealth*, 322 S.W.3d 81, 87 (Ky. 2010) ("If the misconduct is objected to, we will reverse on that ground if proof of the defendant's guilt was not such as to render the misconduct harmless . . . ."). Based upon the evidence presented to the jury, we agree with the Commonwealth that if error occurred, it was harmless and under Kentucky Rule of Criminal Procedure (RCr) 9.24[4] the comment does not provide a basis for setting aside the jury's verdict.

---

[4] RCr 9.24 states:

No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order, or in anything done or omitted by the court or by any of the parties, is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order unless it appears to the court that the denial of such relief would be inconsistent with substantial justice. The court at every

### III. The Trial Court Did Not Commit Palpable Error by Allowing the Detective to Answer the Commonwealth's Questions about Surveillance Videos.

McRae's next claim is that the trial court committed palpable error by allowing Detective Snider, who had no personal knowledge of the events, to narrate the surveillance videos from the Laundry Connection and the apartments on Norene Lane. Under RCr 10.26,[5] if an unpreserved error is found to be palpable and if it affects the substantial rights of the defendant, the appellate court may grant appropriate relief if manifest injustice has resulted from the error. An error is palpable when it is "easily perceptible, plain, obvious and readily noticeable." *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006). The error must be "so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process." *Martin v. Commonwealth*, 207 S.W.3d 1, 5 (Ky. 2006).

In this case, based upon conversations with friends and neighbors who interacted with Hague the night of his murder, Detective Snider collected relevant videos from the Laundry Connection and the Norene Lane apartments. He obtained the videos within a few days of Hague's murder. The

---

stage of the proceeding must disregard any error or defect in the proceeding that does not affect the substantial rights of the parties.

[5] RCr 10.26 states:

A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.

13

Commonwealth played portions of the videos during Doug's and Ryan's testimony which preceded Detective Snider's testimony. Doug identified Hague in the video from the Laundry Connection, noting the type of shirt he was wearing. Ryan identified Hague in the video from the apartment complex, describing the point when Hague asked him for a ride.[6] Ryan also testified that Hague got into the dark-colored, small car, parked behind his back door, with the black man and left and that he never saw him again. When Detective Snider testified, the Commonwealth, commenting at times about the blurriness of the videos,[7] asked him questions about the videos and their content. The videos, along with other testimony including that of Ryan and Doug, established a timeline of events which occurred the night Hague was killed, including Hague and Doug walking to Ryan's apartment; Hague and Doug entering the laundromat, talking with the attendant, and leaving; Hague returning to Ryan's apartment; Ryan talking with Hague and McRae and McRae dropping a handgun; and finally Hague leaving Ryan's apartment with McRae.

The prosecution played video clips for the jury as Detective Snider was questioned. Prior testimony indicated that at least some of the video timestamps were erroneous, and Detective Snider provided testimony about the actual time of the events the jury viewed. When the Commonwealth asked why

---

[6] Ryan also indicated in his testimony that the video was not the best quality, stating at one point, "I believe that's me."

[7] Detective Snider made similar comments.

14

the Norene Lane apartment video (which was actually video from multiple cameras) was collected, Detective Snider explained that the Laundry Connection video showed that Hague came in with Doug (Detective Snider noted that the jury had already heard from Doug about the visit to the laundromat), and that it was about 10-10:30 p.m. when Hague appeared to be leaving the Laundry Connection and talked with Doug who was in the car. At one point in the video presentation, the Commonwealth asked Detective Snider, "Who are the two individuals standing out here?" and he identified one as Doug and the other as Hague.

When the focus was shifting from the Laundry Connection video to the Norene Lane apartment video, upon the Commonwealth's request, Detective Snider described the roads in the area and the cut-through to the Laundry Connection and pointed out Hague's "heading off in this direction," which was toward the apartment complex. As requested by the Commonwealth, Detective Snider particularly described the roads around the Norene Lane apartments. Responding to the Commonwealth's instruction to "point to us anything of notice," Detective Snider noted that Hague can be seen coming into the frame, running, slowing down, and stopping at the apartment. The Commonwealth again had Detective Snider compare the timestamps on the Laundry Connection and Norene Lane apartment videos.

Soon thereafter, the Commonwealth asked Detective Snider if the video reflected anything of note other than Hague. Detective Snider noted the arrival of a car and responded "yes" to the Commonwealth's question whether the

15

individual in the white shorts, now known to be McRae, came out of the car which was just seen parked on video from another apartment complex camera. Afterward, when answering the Commonwealth's questions, Detective Snider, referencing the videos, described being unsuccessful in locating Donnie who was at the apartment and interacted with McRae. The detective also described the relevant information that Ryan provided to him during his interview, again referring to the black man in the videos as McRae. McRae did not object to the questions the Commonwealth asked and does not argue now that the questions themselves were improper.

Before this Court, McRae complains generally about Detective Snider "narrating and interpreting" the videos and complains specifically that Detective Snider was allowed to identify the individuals in the videos, including Hague and McRae. He also contends that Detective Snider's narration and identifications were not verified by other witnesses with personal knowledge of the events. The Commonwealth responds that palpable error did not occur and also points out that other witnesses identified McRae in still photos from surveillance video and Hague in the video footage from the Laundry Connection and the Norene Lane apartments.

McRae cites *Boyd v. Commonwealth*, 439 S.W.3d 126 (Ky. 2014), in support of his argument that Detective Snider should not have been permitted to narrate and interpret the videos. In *Boyd*, Faulkner's security camera captured his assault and the burglary of his home by two assailants. Richardson, also in the home at the time, ran and hid when the assailants

16

entered the home. During trial, both Faulkner and Richardson narrated the footage for the jury. Richardson identified the two assailants and narrated the events she witnessed in real time, and those that took place after she had run for cover. Faulkner narrated footage from before he was aware of the intruders and after he had been knocked unconscious. As to the portions of the video representing events that Faulkner and Richardson did not perceive in real time, this Court found those parts of the narration violated Kentucky Rules of Evidence (KRE) 602 and 701 because the testimony exceeded the witnesses' personal knowledge of the events. However, we also determined the error was harmless because the jurors were watching the video and were in a position to interpret the security footage independently from the witnesses' testimony. 439 S.W.3d at 129-32.

Generally, the testimony of a lay witness is limited to matters or facts about which he has personal knowledge. *See* KRE 602; KRE 701; *Toler v. Sud-Chemie, Inc.*, 458 S.W.3d 276, 287 (Ky. 2014); *Martin v. Commonwealth*, 13 S.W.3d 232, 235 (Ky. 1999). However, a lay witness is permitted to give opinion testimony, i.e., what he believed, thought, or suspected, about a matter when the witness's opinion is based on knowledge not available to the jury and would be helpful to the jury in reaching its own opinion. *See* KRE 701; *Gabbard v. Commonwealth*, 297 S.W.3d 844, 855 (Ky. 2009). While generally the jury must decide what is depicted in a video, a detective may explain the relationship of different items of evidence in the context of his investigation,

17

particularly when, as here, multiple video recordings are presented from different locations and different viewpoints within those locations.

We begin with McRae's general complaint that Detective Snider narrated and interpreted the videos. Upon review, we believe Detective Snider's testimony may be viewed as narrative in the sense that it provided the jury with information about the differential between the video timestamps and the actual time of the day, and like Doug's and Ryan's testimony, the sequence of Hague's actions in the latter part of the day on July 25, 2017 leading up to the point when he crossed paths with the man later identified as McRae. Detective Snider's testimony, however, was not narrative in the sense that his testimony was responsive to the Commonwealth's questions. *Cuzick v. Commonwealth*, 276 S.W.3d 260, 266 (Ky. 2009). Furthermore, "[n]arrative testimony is not necessarily interpretive testimony." *Id.* To the extent Detective Snider testified about events he was not personally familiar with, he did not testify to anything that was not captured in the recordings. In short, Detective Snider's testimony did not progress improperly into the realm of offering opinions.

In regard to McRae's complaint that Detective Snider was allowed to identify Hague and McRae, as noted above, prior to Detective Snider's testimony, other witnesses had already testified, identifying Hague and McRae without objection. Hague was identified in both the laundromat and apartment videos. When Detective Snider later testified as to Hague leaving the laundromat's video footage and then entering the apartment's video footage, it appears Hague's identity was an uncontested fact, further evidenced by the

18

absence of any objection from the defense. As to the identification of McRae, that came through the Commonwealth with its question whether the individual in the white shorts, "who we have learned is McRae," came out of the car just seen parked on another camera. Detective Snider then maintained his reference to the black man in the video as McRae. Even if Detective Snider's identification of McRae were an explicit identification, it would follow, for the same reasons as Hague's identification, that no obvious plain error occurred. Also, as pointed out by the Commonwealth, McRae's guilt was dependent on factors other than Hague's prior visits with others and the videos Detective Snider discussed did not depict who shot the victim. Given the testimony preceding Detective Snider's testimony, if error occurred, it certainly was not palpable and so fundamental that it threatened the integrity of the judicial process. *Brewer*, 206 S.W.3d at 349; *Martin*, 207 S.W.3d at 5.

### IV. The Trial Court Did Not Err by Denying McRae's Request to Recross-examine the Detective.

McRae sought to recross-examine Detective Snider on two topics. As described on appeal, those topics were the forensic testing of a phone retrieved from the search of McRae's house and Detective Snider's decision not to use a photo pack when interviewing Juvon Foster, who identified McRae in the still photo from the Norene Lane apartment surveillance video. After hearing several hours of testimony from the detective, the trial court ruled that Detective Snider's examination was complete, with the detective having been cross-examined by McRae for over two hours. McRae objected and now argues that the trial court abused its discretion by denying him the opportunity to

19

recross-examine Detective Snider and impeach him on the new topics of testimony first raised on redirect examination. We review Detective Snider's testimony on those two topics.

In Thorn's interview with the detectives, he stated that McRae and Hague had communicated through Facebook. During Detective Snider's cross-examination, he testified that a telephone was recovered from a search of McRae's home, and that LMPD[8] ran a forensic test on the phone. He agreed with defense counsel that no Facebook messages between McRae and Hague were found on the phone. He stated that "There was pretty much nothing on that phone." When the Commonwealth questioned Detective Snider on redirect, he explained the process of testing the phone through downloading the data and based upon the download, reiterated that the phone appeared not to really have been used: it reflected no calls or messages and nothing of substance.

In Thorn's police interview, Thorn stated that McRae had sold the gun he used to shoot Hague to Juvon Foster. When Detective Snider interviewed Foster, Foster admitted that McRae sold him a gun. Detective Snider then presented a still photo from the Norene Lane apartment surveillance video and asked Foster if he could identify anyone. Foster identified the black man in the photo as McRae. During Detective Snider's cross-examination, he agreed that he did not present a photo pack to Foster for McRae's identification but

---

[8] Louisville Metro Police Department.

explained that was because McRae was not a stranger to Foster and he was confirming that the person in the photo was the same Martice McRae that Foster knew. Upon redirect, the Commonwealth asked Detective Snider to explain a photo array for the jury. In addition to explaining the different methods of presenting photos when trying to identify a suspect, he testified that he normally does not use a photo array when a witness already knows the suspect.

McRae identifies the foregoing testimony on redirect examination as Detective Snider testifying for the first time that he did not have McRae's phone forensically examined and Detective Snider offering for the first time his excuse for failing to present a photo pack to Foster. Upon review, we cannot agree with McRae that Detective Snider's testimony on redirect presented new information for which recross-examination was warranted. As noted above, Detective Snider testified during his cross-examination that the phone was forensically tested and then he explained that testing during his testimony on redirect. Detective Snider's description of the testing procedure and his reiteration of his statement that the phone lacked content did not raise any new matter on redirect. As to the photo pack argument, Detective Snider explained on cross-examination how and when he normally uses a photo pack in his investigations.

The trial court has great latitude in imposing reasonable limitations on cross-examinations and acts within its purview in limiting examinations that are harassing, confusing, repetitive, or only marginally relevant. *Davenport v.*

21

*Commonwealth*, 177 S.W.3d 763, 768 (Ky. 2005) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 683 (1986)); *see* KRE 611(a), (b). Here, Detective Snider had been examined and cross-examined, and subsequently recalled by the Commonwealth, testifying to matters which he had already addressed during his cross-examination. A trial court does not abuse its discretion in denying a request for recross-examination when the redirect testimony does not involve new matter and is only an amplification of previous testimony elicited during cross-examination.

## CONCLUSION

For the foregoing reasons, the Jefferson Circuit Court's judgment is affirmed.

All sitting. All concur.


COUNSEL FOR APPELLANT:

Michael Lawrence Goodwin
Ashlea Nicole Hellmann


COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Perry Thomas Ryan
Assistant Attorney General